**Elizabeth H. Potter (OSB # 105482)**
epotter@advocateswest.org
**Laurence ("Laird") J. Lucas (ISB # 4733)** *Pro Hac Vice Application Pending*
llucas@advocateswest.org
*Advocates for the West*
P.O. Box 1682
Bend, OR 97709
(503) 954-2721

**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR  97211
(503) 525-0193
lacy@onda.org

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

|  |  |
|---|---|
| **OREGON NATURAL DESERT ASS'N, FRIENDS OF NEVADA WILDERNESS,** and **IDAHO CONSERVATION LEAGUE,** | No. 24-145 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| **U.S. DEPARTMENT OF THE AIR FORCE,** | |
| Defendant. | |

## INTRODUCTION

1.      The Owyhee Canyonlands are a vast and wild landscape of rolling sagebrush steppe and hundreds of miles of deep, rugged canyons punctuated by honeycomb-like spires, caldera rims, and mountain ranges. Spanning thousands of square miles where Oregon, Idaho, and Nevada converge, this high-desert landscape supports hundreds of species of fish, wildlife, and plants, some of which are so unique and rare that they appear nowhere else on earth. People prize the Owyhee for its unfragmented beauty and quietude and have been living on, working, and enjoying this landscape for thousands of years. Plaintiffs Oregon Natural Desert Association ("ONDA"), Friends of Nevada Wilderness ("FNW"), and Idaho Conservation League ("ICL") have been working for decades to protect, defend, and restore this unique and fragile landscape.

2.      Plaintiffs challenge Defendant U.S. Department of the Air Force's ("Air Force") decision to dramatically expand and intensify military aircraft trainings over the Owyhee Canyonlands of Oregon, Idaho, and Nevada, as set forth in the July 2023 Record of Decision ("ROD") and March 2023 Environmental Impact Statement ("EIS") entitled "Airspace Optimization for Readiness, Mountain Home Air Force Base."

3.      This "Owyhee Airspace Optimization" decision will increase noise, habitat fragmentation, fire risk, and other impacts of F-15 fighter jet overflights from the Mountain Home Air Force Base by allowing low altitude supersonic and subsonic fighter training exercises across some 7.5 million acres of the Owyhee Canyonlands, spanning three states, including over Wilderness Areas, Wild and Scenic Rivers, and key habitats for imperiled greater sage-grouse and bighorn sheep. More frequent and low-level flights jeopardize the quiet and solitude of the Owyhee Canyonlands region that is prized by Plaintiffs and their members.

4.      The expansion of military training flights under this decision will be particularly intense over the Air Force's Paradise North Military Operations Area ("MOA") in southeastern Oregon and the Paradise South, Owyhee South, and Jarbidge South MOAs in northern Nevada. Previously, the Air Force prohibited low-altitude subsonic overflights below 3,000 feet above ground level, but now F-15 military fighter jets may descend to very low altitudes—just 100 feet above the ground. For supersonic flights—those that create deafening "sonic booms"—the Air Force had prohibited such flights below 30,000 feet but now allows them as low as 10,000 feet.

5.      The Owyhee Airspace Optimization decision will have substantial adverse effects on wildlife, wildlands, watersheds, and communities in the area. By flying lower than the top of a tall tree, military jets will dramatically increase noise levels and permanently alter the soundscape throughout these rural and wild areas of national significance. Resulting noise levels and visual intrusions will disturb and harm people who work or recreate outside, along with iconic but imperiled species like bighorn sheep and sage-grouse.

6.      As part of these military training exercises, the Air Force plans to drop nearly 19,000 chaff bundles (which are comprised of millions of aluminum-coated glass fibers in canisters) and 18,000 flares (which are pyrotechnic devices used to attract heat-seeking missiles) annually, amounting to dozens each day. This will disperse a considerable amount of debris and pollution across roughly 12,000 square miles and into the life-sustaining waterways within this arid region. The discharge of flares in these areas will pose a serious risk of wildfire, which threatens the human and natural communities in the area.

7.      The Air Force downplayed these adverse effects in the EIS and ROD, including by failing to consider or adopt alternatives or measures that would have avoided or mitigated impacts to key resources.

COMPLAINT - 2

8.      By failing to take a "hard look" at adverse impacts and mitigation measures, consider a reasonable range of alternatives, and fully engage the public, the Air Force failed to provide for the informed agency decision making and meaningful public participation required by the National Environmental Policy Act ("NEPA") and its implementing regulations, in violation of NEPA and the Administrative Procedure Act ("APA"). Accordingly, and because the Air Force's EIS and ROD are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, this Court should set aside and vacate the EIS and ROD for the Owyhee Airspace Optimization decision.

## JURISDICTION AND VENUE

9.      Jurisdiction is proper in this Court under 28 U.S.C. §§ 1346 and 1331 because this action involves the United States as a defendant and arises under the laws of the United States, including the APA, 5 U.S.C. § 701 *et seq*.; NEPA, 42 U.S.C. § 4321 *et seq*.; the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*.; and applicable regulations.

10.     An actual, justiciable controversy exists between Plaintiffs and the Air Force. The requested relief is proper under 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 701–706. The challenged agency actions are final and subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because ONDA resides in this district, a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and affected lands and resources in question are located in this district.

12.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

//

COMPLAINT - 3

## PARTIES

13.    Plaintiff OREGON NATURAL DESERT ASSOCIATION is an Oregon nonprofit, public interest organization of about 18,000 members and supporters. It has offices in Portland, Oregon and Bend, Oregon. ONDA's mission is to protect, defend, and restore forever Oregon's high desert for present and future generations.

14.    Plaintiff FRIENDS OF NEVADA WILDERNESS is a Nevada nonprofit, public interest organization of about 16,000 members and supporters. It has offices in Reno, Nevada and Las Vegas, Nevada. FNW's mission is dedicated to preserving all qualified Nevada public lands as wilderness, protecting all present and potential wilderness from ongoing threats, educating the public about the values of, and need for, wilderness, and improving the management and restoration of these wild lands.

15.    Plaintiff IDAHO CONSERVATION LEAGUE is an Idaho nonprofit conservation organization founded in 1973. ICL is headquartered in Boise, Idaho and also has offices and staff in Ketchum, McCall, and Sandpoint, Idaho. ICL is dedicated to protecting Idaho's wild lands, clean water and air, healthy families, and way of life. Central to ICL's mission is protecting public lands and the fish and wildlife they sustain from high-risk natural resource use projects. ICL has more than 30,000 members and supporters located across Idaho and the nation.

16.    Plaintiffs bring this action on their own behalf and on behalf of their members and staff, many of whom regularly enjoy and will continue to enjoy the public lands, waters, and resources that are adversely affected by the Air Force's Owyhee Airspace Optimization decision for educational, recreational, spiritual, and scientific activities.

17.    Plaintiffs actively participate in Air Force and Department of the Defense decision-making processes concerning or affecting public lands and waters in eastern Oregon,

northern Nevada, and southern Idaho. Plaintiffs have also been active in monitoring ecological conditions and wilderness values on public lands affected by the Air Force's training activities in eastern Oregon, northern Nevada, and southern Idaho, including throughout the greater Owyhee region. Plaintiffs participated throughout the public processes that led to the Air Force's release of the EIS and ROD that allow more intensive fighter jet training activities throughout the six training areas in Oregon, Nevada, and Idaho.

18.    Plaintiffs and their members use and enjoy the public lands, waters, and natural resources within and surrounding the area encompassed by the Paradise North, Paradise South, Owyhee North, Owyhee South, Jarbidge North, and Jarbidge South MOAs for recreational, scientific, spiritual, educational, aesthetic, and other purposes. They enjoy fishing, rafting, hiking, camping, hunting, bird watching, study, contemplation, photography, and other activities in and around these public lands and waters. Plaintiffs and their members also participate in information gathering and dissemination, education and public outreach, engaging in agency planning processes, and other activities relating to the Air Force's activities on, over, or otherwise affecting these public lands and waters.

19.    The Owyhee Airspace Optimization decision will adversely affect Plaintiffs' members by increasing noise levels and shocking sightings of planes racing over and through the canyonlands; harassing and displacing wildlife so that members will be less likely to observe those sensitive desert species; generating pollution that will impair waterways and wildlands and increase wildfire risk; and threatening cultural artifacts, sites and resources and other values. As a result of these and other impacts, the environmental, health, aesthetic, and recreational interests of Plaintiffs' members have been, are being, and will be adversely affected by the Air Force's

training exercises and by Plaintiffs' members' reasonable concerns related to the effects of the newly intensified training regime.

20.     Plaintiffs' members and supporters, and each organization as a whole, have suffered and will suffer irreparable injury as a result of the Air Force's unlawful actions. The Air Force's NEPA violations increase the risk that the significant environmental impacts of the Owyhee Airspace Optimization decision will be overlooked, causing unnecessary interference with and harm to their aesthetic, recreational, scientific, spiritual, educational, and professional interests. The Air Force's failure to consider and adopt an action alternative and/or mitigation measures that avoid or limit the impacts of the Owyhee Airspace Optimization decision deprived Plaintiffs and their members of adequate information and protection for their interests.

21.     Such injuries will be redressed by the relief sought herein.

22.     Plaintiffs have no adequate remedy at law to address the foregoing injuries to their interests.

23.     Defendant U.S. AIR FORCE is a military department of the U.S. Department of Defense within the Executive Branch of the U.S. Government.

## LEGAL BACKGROUND

### National Environmental Policy Act (NEPA)

24.     NEPA "is our basic national charter for protection of the environment." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)). The statute "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). An agency's obligation, under NEPA, to obtain and disclose environmental information during

the public review process is central to NEPA's core principle of "democratic decisionmaking." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 n.24, 1122 (9th Cir. 2010).

25.     Congress adopted NEPA to "encourage productive and enjoyable harmony between man and his environment," and "to promote efforts which will prevent or eliminate damage to the environment and biosphere," among other stated purposes. 42 U.S.C. § 4321, as amended through Pub. L. 118-5, 137 Stat. 10 (2023) (to be codified at 42 U.S.C. § 4321 *et seq*.).

26.     The Council on Environmental Quality has promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. § 1500 *et seq.*[1] The Air Force has also adopted its own regulations implementing NEPA. 32 C.F.R. § 989 *et seq*.

27.     NEPA requires that federal agencies must prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

28.     An EIS must include, *inter alia*, a detailed statement of: (1) the environmental effects—including direct, indirect, and cumulative effects—of the proposed action; (2) any adverse environmental effects that cannot be avoided if the proposed action is implemented; (3) reasonable alternatives to the proposed action; and (4) mitigation measures to minimize any significant effects identified. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.10, 1502.14, 1502.16.

29.     Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

---

[1] Recent revisions to NEPA's regulations, 85 Fed. Reg. 43,304, 43,339 (July 16, 2020), do not apply because the EIS process started while the prior version of the regulations was in effect. Accordingly, this complaint cites the 1978 regulations that the EIS and ROD applied.

30.     Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

31.     Cumulative effects are the impacts on the environment that result from incremental impacts of the action when added to all other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." *Id.*

32.     The consideration of alternatives is also at the heart of NEPA review. Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"; "[d]evote substantial treatment to each alternative considered in detail including the proposed action"; and "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency." *Id.* § 1502.14(a)–(c).

33.     Under the Air Force's NEPA regulations, the "Air Force must also consider reasonable alternatives raised during the scoping process [] or suggested by others, as well as combinations of alternatives." 32 C.F.R. § 989.8(b). The Air Force may develop written standards to determine what a "reasonable" alternative is for a project, but "must not so narrowly define these standards that they unnecessarily limit consideration to the proposal initially favored by proponents." *Id.* § 989.8 (c).

34.     NEPA requires agencies to "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document." Pub. L. 118-5 § 321(a)(3)(C)(6)(D), 137 Stat. 10 (2023) (to be codified at 42 U.S.C. § 4332(D)). Agencies "shall identify any methodologies used[,] and shall make explicit reference by footnote to the scientific

and other sources relied upon for conclusions." 40 C.F.R. § 1502.24. The agency's environmental information "must be of high quality." *Id.* § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

35.    The agency must disclose if information is incomplete or unavailable, and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b). The agency must obtain missing information that is relevant to assessing significant impacts unless the means of doing so are unknown or the costs unreasonable. *Id.*

36.    The Air Force's NEPA regulations emphasize the importance of mitigation measures. "Both the public and the Air Force community need to know what commitments are being considered and selected, and who will be responsible for implementing, funding, and monitoring the mitigation measures." 32 C.F.R. § 989.22(a). When preparing an EIS, the Air Force must "indicate clearly whether mitigation measures [] must be implemented for the alternative selected," and identify "the specific [best management practices] being used and include those [] in the mitigation plan." *Id*.

37.    Mitigation options include: "(a) Avoiding the impact altogether by not taking a certain action or parts of an action. (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. (c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment. (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. (e) Compensating for the impact by replacing or providing substitute resources or environments." 40 C.F.R. § 1508.20.

38.    The Air Force's NEPA regulations also emphasize the importance of pollution prevention. "Pollution prevention approaches should be applied to all pollution-generating

activities." 32 C.F.R. § 989.31. "Where pollution cannot be prevented, the environmental

analysis and proposed mitigation measures should include, wherever possible, recycling, energy

recovery, treatment, and environmentally safe disposal actions." *Id.*

39.     The Air Force NEPA regulations expressly require consideration of

environmental justice during the NEPA process. *See* 32 C.F.R. § 989.33 (requiring compliance

with Executive Order 12,898, which directs agencies to identify and address disproportionate

adverse impacts of their activities on minority and low-income populations).

40.     When issuing a Record of Decision (ROD), the Air Force "should summarize all

the major factors the agency weighed in making its decision," and "must state whether the

selected alternative employs all practicable means to avoid, minimize, or mitigate environmental

impacts and, if not, explain why not." 32 C.F.R. § 989.21(b)–(c).

41.     When a ROD relies on mitigation measures, the Air Force must prepare a "plan

specifically identifying each mitigation, discussing how the proponent will execute the

mitigations, identifying who will fund and implement the mitigations, and stating when the

proponent will complete the mitigation." *Id.* § 989.22(d); *see also* 40 C.F.R. § 1505.2(c) ("A

monitoring and enforcement program shall be adopted and summarized where applicable for any

mitigation."). The Air Force must then "ensure compliance with mitigation requirements" and

monitor their effectiveness. 32 C.F.R. § 989.22(b).

42.     Public participation and intergovernmental consultation are paramount to the

NEPA process. NEPA's goals are to "insure that environmental information is available to public

officials and citizens before decisions are made and actions are taken," and to "help public

officials make decisions that are based on [an] understanding of environmental consequences,

and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b)–(c).

43. To that end, NEPA's implementing regulations require federal agencies to encourage and facilitate public involvement "to the fullest extent possible," *id.* § 1500.2, and identify public scrutiny as an "essential" part of the NEPA process, *id.* § 1500.1(b); *see also id.* § 1501.4(b) (Agencies must "involve . . . the public, to the extent practicable"); *id.* § 1506.6 ("Agencies shall: (a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures" and give "public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected," and "solicit appropriate information from the public."). "In all cases the agency shall mail notice to those who have requested it on an individual action." 40 C.F.R. § 1506.6(b)(1).

44. The Air Force must hold public hearings on draft EISs "at a time and place and in an area readily accessible to military and civilian organizations and individuals interested in the proposed action." 32 C.F.R. § 989 App. C, A3.4.

45. When issuing a Draft EIS, Final EIS, or a ROD, the Air Force must provide public notice. *Id.* § 989.24(a). This must include advertisements in a "prominent section of the local newspaper(s) of general circulation (not "legal" newspapers or "legal section" of general newspapers). *Id.* § 989.24(c). For "actions of local concern," the Air Force should provide notice to at least local government representatives and the local news media. *Id.*

## FACTUAL BACKGROUND

### History of the Air Force's Owyhee Airspace Optimization Decision

46. The Owyhee Canyonlands are a wild, rugged, and spectacular area spanning thousands of square miles in southeastern Oregon, southwestern Idaho, and northern Nevada. This high-desert landscape is home to more than 500 miles of rivers and streams and more than 200 species of wildlife, including bighorn sheep, greater sage-grouse, Great Basin redband trout,

golden eagles, peregrine falcons, and pronghorn. It includes some of the most remote and wild landscapes and some of the darkest nighttime skies in the lower 48 states. People have lived in the Owyhee since time immemorial, and local tribes today continue to value culturally and religiously important sites and native plants, animals, and other resources throughout the region.

47.     The federal government has identified nearly 1.6 million acres of wilderness-quality public lands in the area, including congressionally designated Wilderness areas like the Owyhee River Wilderness in Idaho and the Jarbidge Wilderness in Nevada, along with Wilderness Study Areas ("WSA") and Lands with Wilderness Characteristics ("LWC") designated by the federal Bureau of Land Management ("BLM") in Oregon and Nevada.

48.     The Air Force's Mountain Home Air Force Base in Idaho has long sought to increase military training exercises within the Owyhee Canyonlands and the surrounding area. The Air Force has long assumed, incorrectly, that there would be little public opposition given the region's remoteness and sparse population.

49.     In 1989, the Air Force proposed a major expansion of operations within Idaho. Ranchers, conservationists, recreationists, scientists, hunters and anglers, and the Shoshone-Bannock Tribe of Duck Valley raised serious concerns about the likely impacts and damage to public, private, and tribal lands and resources. As a result of litigation in subsequent years, the Air Force agreed, through a settlement agreement approved by the District of Idaho to which Plaintiff ICL was a party, to restrictions on its airspace operations within Idaho.

**Overview of the Owyhee Airspace Optimization Decision**

50.     Mountain Home Air Force Base is located in southwestern Idaho. The base provides military training primarily for Idaho-based units with the F-15E Strike Eagle aircraft, in Special Use Airspace ("SUA") associated with the base. Mountain Home's SUA includes six

MOAs: Paradise North, which is located in southeastern Oregon; Owyhee North and Jarbidge North, which are located in Idaho; and Paradise South, Owyhee South, and Jarbidge South, which are located in Nevada. The following map depicts these MOAs:



**Owyhee Airspace Optimization FEIS Figure 1.1-1.
Special Use Airspace Associated with Mountain Home AFB**

51.     The Oregon and Nevada MOAs have long had subsonic operational floors at 10,000 feet mean sea level or 3,000 feet above ground level, whichever is higher, and supersonic floors at 30,000-foot mean sea level.

52.     The Idaho MOAs have had much lower airspace floors—100 feet above ground level for subsonic operations and 10,000 feet above ground level for supersonic operations— with minor exceptions.

53.     Some of those exceptions stem from a court-approved settlement agreement between the Air Force and a coalition of conservation organizations in Idaho including Plaintiff ICL, and from other agreements with entities including BLM. These exceptions set some

restrictions on training flights in Idaho above certain rivers and Wilderness Study Areas, including the Owyhee Wild and Scenic Rivers system, and during bighorn sheep lambing season.

54.     Nevada and Oregon will bear the brunt of the impacts of the new decision. In these states, military jets may now fly as low as 100 feet above the ground—lower than a tall tree—at subsonic speeds, and as low as 10,000 feet above ground level at supersonic speeds. This is a massive change, allowing fighter jets to fly three times closer to the ground at supersonic speeds and an astounding 30 times closer to the ground at subsonic speeds.

55.     A supersonic flight compresses the air around an aircraft, which results in a sonic boom that can sound like a sharp clap or a distant rumble depending upon how high and fast the aircraft flies, among other variables. Sonic booms can be extremely startling and upsetting to humans and wildlife alike, and can even damage structures like houses and barns.

56.     Supersonic operations will increase by more than 300% compared to the baseline in Paradise North in Oregon, and by more than 75% in Paradise South, Owyhee South, and Jarbidge South in Nevada.

57.     In Oregon, approximately 6,838 supersonic operations and sonic booms will occur annually, or nearly 19 every day as a result.

58.     In each of the Nevada MOAs, training exercises will increase by more than 80% compared to the baseline.

59.     Approximately 15% of training operations will occur at night, between 10:00 pm and 7:00 am, which threatens people and wildlife who are sleeping or engaging in activities like driving that are more difficult at night in the dark. In Nevada, night operations will increase by more than 136% percent over the baseline.

60.     Training flights may traverse the same MOA multiple times during the same training exercise, resulting in impacts throughout a single day in some places.

61.     The Air Force admitted that the noise generated by these expanded training activities threatens to startle people, cause momentary pain, and interfere with activities like conversation, sleeping, or working; cause structural damage to buildings from increasing sonic boom intensity; disturb people seeking solitude and quietness in the remote Owyhee Canyonlands; stress wildlife and interfere with their life history; and lead to "disproportionately high and adverse impacts" on "minority and low-income populations" in the area, particularly within the Fort McDermitt Indian Reservation.

### The Air Force's Environmental Review Process

62.     On October 16, 2019, the Air Force began a scoping process under NEPA by announcing in the Federal Register its intent to prepare an EIS and publishing advertisements in newspapers in Idaho and Nevada, but not Oregon. The Air Force held four public scoping meetings in-person in Idaho, but none in Oregon or Nevada.

63.     On July 9, 2021, the Air Force issued a Draft EIS and announced its availability in the Federal Register and some local newspapers, and sent copies to certain interested parties. The Air Force hosted three in-person public hearings in Idaho and a virtual webcast, but did not hold meetings in Oregon or Nevada, even though the bulk of the impacts will be borne by communities in those states.

64.     The Air Force received approximately 2,894 public comments on the Draft EIS. The most prevalent concerns involved noise impacts on wildlife species, particularly sage-grouse, migratory birds, bighorn sheep and other big game; effects from sonic booms on humans and structures; impacts to tribal communities at the Duck Valley and Fort McDermitt Indian

Reservations; the potential for increased wildfire from expelled flares; adverse effects on recreational activities and tourism; adverse effects on special places like Wilderness areas, Wilderness Study Areas, Lands with Wilderness Characteristics, Wild and Scenic Rivers, Wildlife Management Areas, and Areas of Critical Environmental Concern; inadequate public involvement; lack of alternatives with adequate environmental protections and limits on training over special areas; questionable need for the Proposed Action; and potential mitigation measures.

65.    The Air Force released a Final EIS in March 2023 that generally failed to address the concerns raised by Plaintiffs, other members of the public, and expert agencies like the Oregon Department of Fish and Wildlife, Nevada Department of Wildlife, and the Idaho Department of Fish and Game.

### The EIS's Purpose and Need and Alternatives

66.    In the EIS, the Air Force claimed that existing altitude floors do not provide adequate opportunities for pilots to obtain low-altitude certification and training in mountainous areas. Yet similar training opportunities are available at other airbases and ranges that do not possess the same nationally unique and largely undisturbed characteristics of the Owyhee Canyonlands.

67.    The EIS's purpose and need section explained that modifications of airspace would provide consistent low-altitude training floors "at or below 500 feet [above ground level] in mountainous areas" and consistent supersonic altitudes down to 5,000 feet above ground level.

68.    In the EIS, the Air Force considered a no-action alternative along with three options for lowering the subsonic floor for low altitude training: 100, 300, or 500 feet above ground level; and two options for lowering the supersonic floor: 5,000 or 10,000 feet above ground level. Each of these options would apply the same floors to all six MOAs.

69.     The EIS admitted that all of the Air Force's action alternatives would have many of the same or similar impacts, indicating that the EIS did not consider meaningfully different alternatives. For example, each of the three subsonic alternatives would result in the same changes to the estimated number of annual aircraft and training exercises in each MOA. And each of the two supersonic alternatives would result in substantially similar changes to the number of annual supersonic events in each MOA.

70.     The EIS did not study in detail the alternatives that Plaintiffs and others urged the Air Force consider in order to avoid or minimize impacts. Those alternatives and mitigation measures included seasonally restricting low-altitude flights during sensitive breeding and nesting periods for the greater sage-grouse, and in bighorn sheep habitat during their lambing period; capping low-altitude fights; allowing training only during predetermined times so that local communities and recreationists may take necessary precautions to protect their interests during those times; placing the most sensitive geographic areas like wilderness-quality lands off-limits to training; or taking advantage of other training locations to avoid new and permanent alterations to the communities and resources in the Owyhee Canyonlands. The Air Force also rejected public comments warning that the agency had so narrowly defined the "purpose and need" of the project that reasonable options for training were ignored.

71.     The EIS dismissed alternatives—including the environmentally-preferable one (the no action alternative)—based on self-imposed screening standards. These standards included ensuring minimal transit time from Mountain Home Air Force Base and requiring Mountain Home Air Force Base to be responsible for scheduling training activities. These standards led the Air Force to reject any alternatives that would have used other airspace, in whole or in part, and

to study only its preferred option: drastically lowering the airspace floors in most of the MOAs for the Mountain Home Air Force Base.

**The EIS's Effects Analysis**

72.     The EIS purported to consider the impacts of the alternatives on several resources, including the acoustic environment (noise), land use and management (including wilderness and other specially protected public lands), biological resources (including wildlife), environmental justice, and cultural resources. But the EIS contained several overarching flaws and failed to analyze key issues related to specific resources.

*Overarching flaws*

73.     Throughout the EIS, the Air Force relied on a gross generalization that flights and flight impacts will be generally uniform across these vast MOAs and assumed any particular location will be overflown infrequently. As a result, the EIS did not address or account for the likelihood that flights—and associated environmental effects—will be concentrated in some locations, such as those with more favorable flying conditions.

74.     For the no action alternative, the EIS claimed that resulting impacts would not change from the status quo. The EIS failed to consider how resources and conditions have changed and will change over time, which will affect the severity and frequency of impacts under the no action alternative in the coming years. As a result, the EIS did not fully identify or disclose the impacts under the no action alternative.

75.     For all alternatives, the EIS ignored that the effects of climate change are unfolding rapidly in this already-arid landscape and will exacerbate impacts of the alternatives and other stressors on human and natural communities there. The EIS also failed to consider how baseline conditions are already shifting and will continue to shift as climate change worsens,

which is poised to harm wildlife, water resources, and recreationists, and pose increased risk of wildfire in the region.

76.     For Idaho, the EIS relied on the fact that the airspace floors there will not change to brush aside or ignore new or worsening impacts. As a result, the EIS ignored the likely impacts that will occur in Idaho from an overall increase in training activities; a change in the specific areas that are subjected to sonic booms; changes in flight patterns due to lowering the airspace "floors" in Oregon and Nevada; and harm to wildlife like sage-grouse, bighorn sheep, and migratory bird populations that rely on habitat in all three states.

77.     The EIS also failed to analyze, in detail, issues related to hazardous materials and water resources, even though the components of chaff and flares may be hazardous and will be deposited on land or in waterways throughout the roughly 12,000-square-mile area affected by the Owyhee Airspace Optimization decision.

*Noise*

78.     The EIS was based on a noise analysis that relied on inaccurate and misleading assumptions and metrics.

79.     The EIS relied on grossly misleading estimates of background sound levels, claiming that representative areas within the roughly 12,000-square-mile training area would largely range from 47–66 DNL. But those are urban and human-centric background levels that exceed even typical noise levels in urban environments. Substantially lower background noise levels (approximately 20 DNL) are typical in a remote area like the Owyhee Canyonlands that is sparsely populated by humans, but teeming with wildlife and offering rare periods of quietude. By failing to obtain or estimate more accurate measurements of baseline noise levels, the EIS did

not accurately assess the severity of the increase in noise levels and the resulting impacts on humans, wildlife, and resources in the area.

80.     The EIS did not explain why obtaining or estimating accurate baseline data was not possible or reasonable. The Air Force is currently funding a study that is estimating background noise levels in sage-grouse habitat where overflights from Mountain Home Air Force Base in Idaho occur. But the EIS did not explain why it did not rely on initial data from that study or wait until its completion to prepare its noise analysis here. A similar study is being developed and funded by the U.S. Navy for its Fallon Range and Training Complex Modernization effort. The EIS also failed to address why it did not propose to conduct similar studies or monitoring before or after its adoption of the Owyhee Airspace Optimization proposal.

81.     The EIS also relied on metrics that are typically used in urban settings, do not accurately address impacts in quieter natural or rural settings that dominate the MOAs, and are inappropriate for assessing impacts to wildlife.[2] For example, the EIS improperly used penalty weighting, which only considers human needs at night and fails to address what time of day is critical for wildlife behaviors that depend upon quiet background sound levels at various times of day. The EIS also refused to consider more applicable and protective standards, such as those developed by the National Park Service, Natural Sounds and Night Skies Division, for use in National Parks (unweighted dB, for 25 days).

---

[2] Those standards include a 65 day-night average sound level ("DNL") noise threshold for subsonic operations and 62 C-weighted day-night average sound level ("CDNL") noise threshold for supersonic operations. DNL means the A-weighted (or accounting for the frequency sensitivity of the human ear) cumulative noise metric based on annual average daily aircraft operations. CDNL is the same as DNL, except that it emphasizes lower frequencies that are felt instead of heard, so it better describes sounds like explosions and sonic booms.

COMPLAINT - 20

82.    In addition to overestimating baseline noise levels, the EIS underestimated the impacts of extremely loud low-level flights at 100 feet above ground level, which can be as loud as 139 dB Lmax[3]—a painful and dangerous level of noise. The EIS claimed that it will be rare for humans to experience such high noise levels and so did not fully or accurately analyze what such extremely loud noise levels will mean for humans, wildlife, and the environment. The EIS also failed to fully consider that such high noise levels may damage animal hearing directly, particularly for raptors roosting on cliffs that are exposed to higher noise levels or any animals that are exposed to overflights by multiple jets at once or multiple overflights in a day.

83.    When considering the impacts of noise on human and natural communities, the EIS ignored key studies and misinterpreted others. For example, there are hundreds of studies that consider the impacts of noise on wildlife, most of which the EIS ignored.

84.    Due to these and other flaws, the EIS underestimated the scope and severity of the increase in background noise levels and the resulting impact to human and natural communities. As a result, the EIS failed to consider or adopt prudent mitigation measures related to the acoustic environment.

*Special Places and Quiet Recreation*

85.    The Owyhee Airspace Optimization decision will affect approximately 12,000 square miles that include exceptional public lands and waters that have earned unique federal protections and recognition. This includes approximately 614,000 acres of congressionally-designated Wilderness Areas in Idaho and Nevada; approximately 430,000 acres of WSAs in Oregon and Nevada; and nearly 535,000 acres of LWCs in Oregon and Nevada. It also includes

---

[3] Lmax measures the maximum sound level.

hundreds of miles of rivers that are protected as congressionally designated Wild and Scenic

Rivers and Nationwide Rivers Inventory segments.

86.    Recreation abounds on these special public lands. The same areas affected by the

Air Force's expanded training operations provide outstanding and nationally significant

opportunities for hiking, camping, stargazing, fishing, hunting, skiing, rock climbing, floating,

rafting and boating, among other quiet outdoor recreational pursuits. As many commenters

noted, people seek out these activities in the Owyhee Canyonlands given the primitive and quiet

character of the region. For some, the Owyhee are a refuge from hectic modern life.

87.    In general, the EIS failed to accurately analyze and disclose potential impacts to

these special places. This incomplete and inaccurate analysis stemmed, in part, from the EIS's

use of a vague, qualitative approach to evaluating noise impacts instead of a protective numerical

standard for these quiet areas. The EIS failed also to disclose how frightening and disruptive a

low-level overflight—just 100 feet above the ground—will be to people recreating in these

remote and quiet areas. The EIS admitted that pilots will not always be able to see and avoid

people on the ground and that direct overflights of people will occur, even though the FAA

generally prohibits such close fly-bys under 500 feet in uncongested areas like these. 14 C.F.R. §

91.119(c). The EIS failed to accurately evaluate how often or how severe direct overflights will

occur and did not adopt mitigation measures specifically to prevent or lessen their impacts.

88.    For wilderness-quality lands in Oregon and Nevada, the EIS admitted that noise

will increase substantially and "permanently alter the overall soundscape" there. Although this

will result in potentially significant impacts to solitude and opportunities for primitive and

unconfined recreation, the EIS claimed the intensified training operations will not degrade the

overall wilderness character of these areas. The EIS based this conclusion on a definition of

wilderness that is inconsistent with the Wilderness Act of 1964, which describes "wilderness" by (1) size, (2) naturalness, and (3) outstanding opportunities for either solitude or primitive and unconfined recreation. 16 U.S.C. § 1131(c). Instead of recognizing that wilderness requires all three of these factors—making the loss or impairment of any factor significant—the Air Force crafted its own definition of wilderness based on five different factors and claimed impacts will only be "significant" if three or more of those five factors are affected. The Air Force also ignored other applicable directives for activities within wilderness-quality lands, including direction from BLM that identifies military exercises as types of activities that should be prohibited if they are not wilderness-dependent and may impair aspects of wilderness character.

89.    For Wild and Scenic Rivers, the EIS admitted that there will be overall adverse effects to scenic, recreation, and other outstanding resource values but claimed—based on a broad and general consideration of the hundreds of miles of protected river segments at issue— that those impacts would not rise to a significant level.

90.    For recreational areas and uses in general, the EIS suggested that the alternatives may curb or present safety concerns for certain activities like hunting and fishing due to disturbances to wildlife, or sports that require a high degree of concentration like rock climbing. But the EIS downplayed these impacts as moderate without adequate analysis or justification.

91.    Given the unpredictability of the precise locations and timing of resulting overflights, it will be difficult or impossible for recreationists to plan their activities to avoid Air Force training exercises. The Air Force failed to propose or evaluate adequate mitigation to provide greater certainty and protection for recreationists. Instead, the EIS touted benefits from pre-existing holiday closures of Mountain Home Air Force Base during three summer weekends, from preexisting mitigation obligations in Idaho, and from spring flight restrictions for subsonic

operations on weekends in the Jarbidge Wilderness. The EIS claimed additional benefits during
"peak floating timeframes" on Wild and Scenic Rivers without providing certainty about when,
where, or why those measures will be implemented. Moreover, the EIS did not evaluate how
effective any of these mitigation measures will be, and it never considered similar or additional
mitigation for other wilderness-quality lands or recreation areas.

92.     The EIS's analysis of recreation overlooked other issues raised by commenters,
including the existence of additional wilderness-quality lands in Nevada.

### Biological resources

93.     The EIS lumped its discussion of impacts to all wildlife, plants, and habitat into
one cursory section entitled "biological resources". This section addressed dozens of imperiled
and protected species like the greater sage-grouse; iconic big game species like bighorn sheep
and elk; and dozens of birds, including bald and golden eagles and peregrine falcons.

94.     The EIS noted that low-level flights and training exercises may affect these
species in a multitude of ways, including direct, physiological changes to their auditory systems;
non-auditory effects like stress and behavioral changes, including impaired breeding, feeding,
and sheltering; injury or death of animals; and cumulative effects that result in population decline
and habitat loss. The EIS claimed, as a general matter, that some wildlife may "habituate" to
noise from aircraft, so impacts will not be significant or affect wildlife populations. The EIS
provided no support for such a broad conclusion about wildlife when individual species and local
populations are likely to react quite differently to sonic booms and other loud noise and
disturbance from near ground-level and low altitude flight training.

95.     The EIS overlooked the impacts of expanded military exercises on wildlife
corridors and habitat connectivity despite federal direction from the Council on Environmental

Quality that the military should take these issues into account when making decisions. The Owyhee Canyonlands include crucial wildlife corridors and habitat connectivity for species such as pronghorn, bighorn sheep, and sage-grouse, but the EIS did not fully or accurately disclose how the Air Force's decision will disturb those areas and contribute to habitat fragmentation.

96.      The EIS did not justify its "summary of impacts" to biological resources, which it broadly claimed will be mild to moderate, short to medium term impacts for many species. By finding that these impacts will not rise to a level considered "significant," the EIS concluded that no additional mitigation measures were necessary to implement any of the alternatives.

### *Greater sage-grouse*

97.      Large expanses of the training areas are identified by the U.S. Fish and Wildlife Service ("FWS"), BLM, and Oregon Department of Wildlife as priority habitat to support conservation and recovery of the greater sage-grouse, a highly imperiled species that relies on intact sagebrush habitat to survive.

98.      The Northern Great Basin sage-grouse population is centered in the tri-state area of southeastern Oregon, southwestern Idaho, and northern Nevada and is considered by FWS to be a core population important to the species' range wide persistence. This area is part of one of two remaining strongholds of continuous sagebrush habitat remaining in all of North America.

99.      Available science shows that sage-grouse avoid leks—key breeding areas—that are exposed to anthropogenic noise, which can lead to population-level declines in abundance. Even limited numbers of passenger vehicles driving near leks can disturb sage-grouse nesting activities and have a significant impact on populations. Sage-grouse are most vulnerable to anthropogenic noise during the breeding season (March through May), nesting season (April through June), and winter (December through February)—or more than half the year.

100.    The EIS admitted that training exercises will generate noise at levels that are known to harm sage-grouse and that the amount of core breeding habitat for sage-grouse exposed to sonic booms will increase. But the EIS failed to fully analyze these impacts and instead asserted, without adequate support, that impacts to sage-grouse will be limited.

101.    When analyzing these impacts and reaching its conclusions, the EIS failed to consider key science and applicable standards.

102.    Most notably, the EIS relied on as a key scientific authority, BLM's 2019 Approved Resource Management Plan Amendments for sage-grouse (the "2019 ARMPAs"), which were adopted during the Trump administration to rollback BLM land management conservation requirements for greater sage-grouse in Idaho, Oregon, Nevada and other states. In both the EIS and ROD, the Air Force failed to recognize that the 2019 ARMPAs were enjoined almost from the time they were adopted and have not been in effect since October 2019. *See W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019) (granting preliminary injunction, which remains in effect today, blocking the 2019 sage-grouse plan rollbacks); *see also Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 825–27 (D. Or. 2022) (this Court discussing the interplay of the 2015 and 2019 ARMPAs, and making clear that "the 2015 ARMPA controls in this case").

103.    Thus, the EIS did not consider the best available science and stronger standards from the applicable 2015 ARMPAs, including a prohibition on "noise and related disruptive activities" within 0.25 miles from leks and on loud activities within a mile of occupied leks for two hours on either side of sunset and sunrise between March and June.

104.    Given that BLM manages 70% of the lands in the training areas, the EIS's failure to consider key federal science and standards from the 2015 ARMPAs that are designed to protect sage-grouse within these public lands was a major oversight.

105.    The EIS also rejected other scientific recommendations for measuring and limiting noise impacts, including protocol recommended by the Nevada Department of Wildlife, which urges limiting anthropogenic noise to a less than a 10 dB increase above baseline levels. Instead, the EIS admitted that noise levels will increase by over 10 dB in Paradise South and Jarbidge South in Nevada without considering how such high noise levels will threaten the abundance of numerous active and important leks and nesting sites present in those MOAs.

106.    The EIS also overlooked the already substantial risk of wildfire to sage-grouse and the serious increase in risk that will result from intensified training activities. Core sage-grouse habitat in eastern Oregon, northern Nevada, and southwestern Idaho has burned in the recent past, and wildfires there have increased in their frequency and severity, particularly in areas where the military airspace training intensification is to occur.

107.    Despite these substantial increases in threats, the EIS concluded that impacts to the greater sage-grouse will be temporary and not cause population-level harm. In so doing, the EIS ignored many critiques by Plaintiffs, other conservation organizations, the Nevada Department of Wildlife, and other experts. Those commenters raised concerns about the EIS's failure to include detailed or accurate information about baseline sage-grouse conditions and habitat, or to accurately disclose the extent to which individual sage-grouse will be affected by noise and what that means for local populations and the species as a whole.

108.    This was a significant oversight given the importance of the Northern Great Basin population to the species as a whole. The EIS needed to conduct a more in-depth analysis of the

alternatives on this core population given the substantial resources that federal, state, local, and tribal governments, scientists, ranchers, conservation organizations, and others are investing in the survival and recovery of this species.

109.    Instead, the EIS touted benefits to sage-grouse from preexisting flight restrictions in Idaho that limit flights from April to June. But the EIS did not explain why the Air Force did not extend those mitigation measures, or adopt others, for Oregon and Nevada, which will bear the brunt of impacts under the action alternatives.

*Bighorn sheep*

110.    As with other species, the EIS admitted that lower-level and louder flights will stress and startle bighorn sheep and cause them to modify their behaviors. Such modifications can include abandonment of favorable lambing, foraging, watering, and sheltering sites, which places them at higher risk of predation and population decline. Yet the EIS downplayed these impacts as insignificant given the short duration and infrequency of training exercises, and claimed, without explanation, that population-level impacts to bighorn sheep will not occur.

111.    The EIS stated that there is limited research available on how low-altitude and supersonic flights affect bighorn sheep, requiring inferences based on studies of other species and information from other locations. But the EIS did not explain why it was unable to analyze or disclose information about how bighorn sheep are affected by existing training in Idaho, and whether the mitigation adopted there has been effective or will continue to be effective.

112.    For example, the EIS cited the fact that bighorn sheep "continue to exist" under similar airspace in Nevada and Arizona but did not disclose whether the training exercises or bighorn sheep populations there are similar or comparable. The EIS also overlooked more

COMPLAINT - 28

applicable studies that found bighorn sheep and related species are stressed and disturbed by aircraft and do not habituate as readily as the EIS suggested.

113.    The EIS admitted that the Idaho Department of Fish and Game has warned that the expansion of military training threatens to negatively impact this species, particularly if it occurs during critical times of the year such as lambing season and over the winter. But the EIS did not meaningfully respond to critiques from bighorn sheep experts, who urged the Air Force to consider the serious harm that will likely result and to adopt mitigation measures to protect bighorns. Moreover, the EIS did not justify why the Air Force did not propose, at a minimum, extending the protections it adopted for bighorn sheep in Idaho to Oregon and Nevada.

### Chaff and flares

114.    Despite the increased use of chaff and flares under the Owyhee Airspace Optimization decision, the EIS summarily dismissed the risks of wildfires and pollution as minimal.

115.    The EIS asserted that the Air Force will limit the release of flares to 5,000 feet above ground level during fire season and thereby reduce wildfire risk. But the EIS did not fully explain whether or why 5,000 feet was selected and how that will reduce the risk of flare-induced wildfires. It also did not address how this mitigation measure will affect the frequency or type of training exercises during fire season, which is becoming longer and more intense due to climate change and drought, and whether this restriction will increase training exercises or the use of flares outside of the delineated fire season. Moreover, the EIS did not address the potential for wildfire *outside* of fire season, which is not a discountable risk as this landscape is already arid and rapidly warming with climate change. In fact, southeastern Oregon is one of the fastest warming areas in the continental United States, with a >3° C rise in temperature since 1895.

116.    The EIS also ignored the frequency of flare and aircraft mishaps. Commenters raised, but the EIS did not address, relevant examples of resulting fires, including several flare fires in 2017 in the Owyhee region and an accidental deployment of a flare too low in New Jersey, which resulted in thousands of evacuations and acres burned, and several homes destroyed or damaged. The EIS also overlooked the serious risk that flare duds may remain ignitable after release.

117.    If a fire does ignite, the EIS did not disclose how difficult fire suppression will be in this rugged and remote terrain. As a result, the EIS did not evaluate, in detail, the potential catastrophic consequences of a wildfire on human and natural communities in the area.

118.    For example, in the past decade alone lightning strikes have ignited wildfires that burned well over one million acres of sage-grouse habitat in southeastern Oregon and Nevada precisely where the Air Force plans to expand and intensify its fighter jet training operations. Since 2012, this area in Oregon has experienced the top three largest fires dating back to 1980: Long Draw (563,337 acres), Holloway (170,359 acres), and Saddle Draw (270,027 acres). In Nevada, the Martin Fire in July 2018 roared through the parched landscape within Paradise South and burned 435,000 acres, which included important sage-grouse habitat.

119.    The EIS also overlooked the serious potential for chaff or flares, or their remnants, to hit and injure or kill people or wildlife, or remain on the landscape where they can injure or harm people and wildlife that encounter them.

120.    For wildlife, the EIS claimed, without explanation or support, that "fire response and rehabilitation would ensure impacts to habitats and species would not reach significant levels." The EIS failed to reconcile that conclusion with the fact that discovering and fighting fires, and rehabilitating burned areas, in such a remote region is exceedingly difficult. Indeed,

studies have shown that sagebrush communities can take more than one hundred years to become reestablished after fire, or may never if cheatgrass—an abundant invasive species—is present. Given that wildfires may be devastating to species like greater sage-grouse and bighorn sheep, the Air Force should have taken a closer look at these risks.

121.    The EIS revealed that there is some potential for waste from chaff and flares—including plastics, chaff wrapping, and dud flares—to become ingestion hazards for wildlife. But it did not evaluate such impacts because it assumed, without explanation, that distribution will be sparse and not "discernibly" affect species.

122.    For water resources, the EIS admitted that chaff fibers and other residual matter "could collect on water surfaces." But inexplicably, the EIS claimed that dropping nearly 19,000 chaff bundles and 18,000 flares each year will not affect ground or surface water quality. This conclusion contradicted studies and other information that shows components of chaff and flares, including aluminum and copper, can be toxic and accumulate and threaten waterbodies and sensitive species that depend on those environments.

123.    Low-level training in the steep, narrow canyons within this region is likely to funnel falling chaff into the surface waters at the bottom of many of these canyons, threatening the water quality there, along with the wildlife and people who depend on these water sources in the desert. Yet the EIS did not fully evaluate this serious risk to waterways in this desert region.

*Environmental justice and cultural resources*

124.    The EIS revealed that the Owyhee Airspace Optimization decision will substantially burden local communities including tribal communities, but the Air Force did not propose, analyze, or adopt adequate measures to fully mitigate these impacts.

COMPLAINT - 31

125.    Two Native American Tribal reservations are located in the affected area: the Duck Valley Reservation within Owyhee North and Owyhee South in Idaho and Nevada, and the Fort McDermitt Indian Reservation within Paradise North and Paradise South in Oregon and Nevada.

126.    The EIS concluded that there will be "disproportionate adverse health and environmental impact to low-income populations" within Paradise South, where the Fort McDermitt reservation is found and tribal members live. These impacts include temporary disruption of learning and speech, and a disproportionate health and safety risk to children. But the EIS downplayed these impacts by claiming that the amount of time aircraft will spend at low altitudes is small and that it engaged in consultations with Tribal governments.

127.    The EIS also proposed an avoidance area over the Fort McDermitt city limits and reservation in which no military operations will occur below 4,500 feet above ground level and no supersonic activities would occur at all. But the EIS did not disclose why the Air Force refused to extend the more stringent mitigation established for the Duck Valley reservation—a complete no fly zone—to the Fort McDermitt reservation. The Air Force's unequal treatment of these Tribal reservations is thus unexplained and unjustified.

128.    The EIS admitted that impacts to cultural resources could occur from an increase in subsonic and supersonic noise but generally downplayed these effects without adequate support. The EIS claimed that the mitigation for Fort McDermitt will reduce the severity of impacts to communities and cultural resources to insignificant levels. But the EIS did not analyze and disclose what noise and visual intrusions will occur even with that mitigation, or what that means for the cultural resources in the area or the affected tribal members who use them. The

EIS also ignored the impact that low-level and supersonic flights will have on cultural resources outside of the reservations, where no mitigation was proposed.

*Cumulative effects*

129.    The EIS did not fully analyze the cumulative effects of the Owyhee Airspace Optimization decision when combined with other past, present, and reasonably foreseeable future actions on these various resources. Instead, the EIS merely listed other projects that might impact the area without grappling with what this means for sensitive resources and imperiled species, and for people who live, work, and recreate in the area.

130.    The EIS's cumulative effects section excluded key projects in the areas, including a massive "Tri-State Fuels Break" project that will impact sage-grouse and other sensitive resources in Oregon and Idaho.

131.    The EIS also ignored how climate change may exacerbate impacts of the Owyhee Airspace Optimization decision on the resources described above and others studied in the EIS.

**The Record of Decision**

132.    On July 14, 2023, the Deputy Assistant Secretary of the Air Force (Installations) signed the ROD that selected Alternative 1 (100-Foot above ground level for subsonic operations) and Alternative B (10,000-Foot above ground level supersonic floor).

133.    The Air Force did not provide direct notice to Plaintiffs and others who participated in the EIS process. On information and belief, the Air Force did not advertise prominently in local newspapers. Instead, even though the ROD was signed in mid-July 2023, the Air Force did not publish its decision in the Federal Register until the following month.

134.    The ROD did not explain why it chose those alternatives in light of the EIS's stated purpose and need for the action. The ROD did not explain why it rejected Alternative 3,

which met the need for subsonic floors *at* 500 feet above ground level but with less intense impacts than the chosen alternative of 100 feet. The ROD also failed to explain why it chose the 10,000 feet above ground level alternative for supersonic operations, even though that alternative would not meet the stated purpose of lowering the supersonic floor down to 5,000 feet above ground level. These inconsistencies raise doubts about the accuracy of the EIS's stated purpose and need and other alternatives that were rejected for failing to meet the purpose and need.

135.    The Air Force's ROD claimed that it had "adopted all practicable means to avoid or minimize environmental harm from the alternatives selected," and developed "discretionary mitigations" to address public concerns, even though most of the mitigation involved preexisting obligations. The ROD ignored the numerous examples of practicable mitigation measures (like extending seasonal restrictions to protect wildlife and recreation in Idaho to Oregon and Nevada) that Plaintiffs and other members of the public proposed.

136.    The ROD stated that the Air Force would subsequently adopt a mitigation plan at some unidentified time and without public notice or input. On information and belief, the Air Force has not yet issued this mitigation plan or announced it to the public.

137.    The ROD stated that the Air Force planned to request the Federal Aviation Administration ("FAA")—a cooperating agency under NEPA—to consider and adopt the EIS and issue its own ROD to implement the Air Force's Airspace proposal. The FAA adopted the Air Force's EIS and issued its own ROD approving the Air Force's request on November 17, 2023, and published it in the Federal Register on November 24, 2023.[4]

---

[4] Plaintiff ONDA filed a petition for review in the Ninth Circuit challenging the FAA's ROD and its reliance on the Air Force's EIS on January 16, 2024, and intends to seek a delay or stay of those proceedings while this case proceeds. *See Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250, 1255 (1st Cir. 1996) (noting that similar FAA petitions "were stayed pending the outcome of the district court proceedings").

## FIRST CLAIM FOR RELIEF
### NEPA and APA Violations:
### Unlawfully Narrow Purpose and Need and Unreasonable Range of Alternatives

138.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

139.    This First Claim for Relief challenges the Air Force's violations of NEPA and implementing regulations in approving the Owyhee Airspace Optimization ROD and EIS based on an unreasonably narrow purpose and need statement and range of alternatives.

140.    The Air Force violated NEPA because the EIS failed to analyze reasonable alternatives to the proposed action, including alternatives identified by the public that would have reduced environmental impacts. Instead, the EIS analyzed alternatives that were not meaningfully different from each other and lacked adequate protections for the environment.

141.    The Air Force selected an unreasonable range of alternatives, in part, due to the EIS's impermissibly narrow purpose and need and its self-imposed standards for screening alternatives that lacked adequate explanation or justification. This is contrary to NEPA and its implementing regulations.

142.    Accordingly, the EIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their board, staff, members, and supporters, and must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF
### NEPA and APA Violations:
### Failure to Take a "Hard Look"

143.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

144.     This Second Claim for Relief challenges the Air Force's violations of NEPA and implementing regulations in approving the Owyhee Airspace Optimization ROD based on the failure of the EIS to take a "hard look" at potential impacts as required by NEPA. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

145.     The EIS and ROD are based upon unsupported assumptions, errors, and omissions; inaccurate and inapplicable standards; and an inaccurate and incomplete baseline of environmental conditions and resources. As a result of these and other issues, the EIS did not fully and appropriately assess and disclose the impacts of the alternatives; did not ensure the scientific accuracy and integrity of the analysis; and did not rely on high-quality information.

146.     The EIS and ROD failed to take a hard look at the potential impacts to the environment of the Owyhee Airspace Optimization decision, including impacts on wildlife like sage-grouse, bighorn sheep, and birds; aquatic resources; recreation; special landscapes including those with wilderness values; local communities; environmental justice; cultural resources; wildfire risks; natural and rural soundscapes; and cumulative effects.

147.     Accordingly, the EIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their board, staff, members, and supporters, and must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF
**NEPA and APA Violations:**
**Failure to Analyze and Adopt Meaningful Mitigation Measures**

148.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

149.    This Third Claim for Relief challenges the Air Force's failure to comply with the mitigation requirements of NEPA and implementing regulations in approving the Owyhee Airspace Optimization ROD and EIS. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

150.    NEPA and implementing regulations emphasize the importance of mitigation measures and require the Air Force to craft and adopt a mitigation plan for the impacts its intensified training program will cause.

151.    The ROD and EIS relied on mitigation measures that are vague, ineffective, and uncertain to occur and will not fully or adequately mitigate harm to natural and cultural resources, wildlife, wildlands, and human communities. In particular, the ROD and EIS failed to include mitigation measures for pollution from chaff and flares that would prevent, recover, or dispose of those materials in an environmentally safe manner. Moreover, the Air Force did not justify its failure to extend mitigation measures that have been in place in Idaho to Oregon and Nevada. Overall, the ROD and EIS failed to demonstrate that the Air Force considered and adopted all practicable means to mitigate the environmental impacts of the decision.

152.    The Air Force also violated its duties to develop, describe, and adopt mitigation measures and a mitigation plan. On information and belief, the Air Force has yet to develop and adopt a mitigation plan even though the ROD relied on mitigation measures.

153.    Accordingly, the Air Force's approval of Owyhee Airspace Optimization ROD and EIS was arbitrary, capricious, an abuse of discretion, and not in accordance with law under NEPA and the APA, which has caused or threatens serious prejudice and injury to the rights and interests of Plaintiffs and their board, members, and staff, and must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CLAIM FOR RELIEF
### NEPA and APA Violations:
### Failure to Provide Adequate Notice and Public Participation

154.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

155.    This Fourth Claim for Relief challenges the Air Force's failure to comply with the public participation and notice requirements of NEPA and implementing regulations in approving the Owyhee Airspace Optimization ROD and EIS. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

156.    NEPA and implementing regulations require federal agencies to involve the public in preparing and considering environmental documents that implement the Act. Meaningful public participation is essential to informed agency decision making under NEPA.

157.    The Air Force violated its duties to inform the public of its Owyhee Airspace Optimization decision and alternatives thereto, to allow for meaningful and timely public involvement, and to respond to public comments and concerns. In particular, the Air Force fell short of its obligations to communities Oregon and Nevada—where the bulk of the adverse effects will occur—by failing to hold in-person public hearings and to advertise prominently in local newspapers. The Air Force also failed to provide adequate notice when it adopted the ROD.

158.    Accordingly, the Air Force's approval of Owyhee Airspace Optimization ROD and EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with law under NEPA and the APA, which has caused or threatens serious prejudice and injury to the rights and interests of Plaintiffs and their board, members, and staff, and must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

a)  Declare, order, and adjudge that the Owyhee Airspace Optimization EIS and ROD violate NEPA and the APA under any or all of the Claims for Relief above;

b)  Reverse, vacate, and set aside the EIS and ROD for violating NEPA and the APA;

c)  Enter such preliminary and/or permanent injunctive relief as Plaintiffs may pray for hereafter;

d)  Award Plaintiffs their reasonable attorney fees, costs, and litigation expenses, under the Equal Access to Justice Act, and/or any other applicable provision of law; and/or

e)  Grant such further and additional relief as the Court deems just and proper or as Plaintiffs may further pray for, in order to remedy the violations of law alleged herein and to protect the interests of Plaintiffs and the public.

DATED:  January 22, 2024                    Respectfully submitted,

s/Elizabeth H. Potter

_____

Elizabeth H. Potter
Laurence ("Laird") J. Lucas
Advocates for the West

s/ Peter M. Lacy

_____

Peter M. Lacy
Oregon Natural Desert Association

*Attorneys for Plaintiffs*

COMPLAINT -  39