**GENEVIEVE GEIGER (CO Bar 53820)**
**KYLE LYONS-BURKE (DC Bar 1655452)**
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 341-2137
genevieve.geiger@usdoj.gov
kyle.lyons-burke@usdoj.gov

*Attorneys for Defendant United States Department of the Air Force*

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PENDLETON DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N,** et al., | **Case No. 2:24-cv-00145-HL** |
| Plaintiffs, | |
| v. | **DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| **U.S. DEPARTMENT OF THE AIR FORCE,** | |
| Defendant. | |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

LEGAL BACKGROUND ............................................................................................ 3

FACTUAL BACKGROUND ....................................................................................... 4

    I.      Mountain Home Air Force Base and Overflight Operations ................. 4

    II.    The Proposed Action and NEPA Process ................................................ 7

STANDARD OF REVIEW ........................................................................................ 8

ARGUMENT ............................................................................................................... 9

    I.      The EIS Fully Satisfies DAF's Obligations Under NEPA ..................... 9

        A.     DAF's Evaluation of Noise Impacts Is Sound ........................... 10

            1.     DAF Identified the Proper Baseline Noise Level ........... 10

            2.     DAF Used a Reasonable Methodology to Analyze
                  Noise Impacts Above the Baseline Level ........................ 12

        B.     DAF Took a Hard Look at Noise Impacts on Wildlife ............... 15

            1.     DAF Appropriately Analyzed the Impact of Noise on
                  the Greater Sage-Grouse ................................................. 15

            2.     DAF's Conclusion Regarding Overflight Frequency
                  Was Reasonable ............................................................... 19

            3.     Additional Habitat-Specific Analysis Was Not
                  Necessary ......................................................................... 22

        C.     DAF Fully Considered Any Increased Risks of Flare-
            Caused Fires ............................................................................... 24

        D.     DAF Appropriately Considered Impacts on Areas with
            Wilderness Qualities .................................................................. 26

        E.     DAF Properly Analyzed Environmental Justice Impacts .......... 30

        F.     DAF Considered Appropriate Alternatives .............................. 33

        G.     If Necessary, the Court Should Order Further Briefing on
            Remedy ....................................................................................... 36

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                  i

II.     The Court Should Strike the Extra-Record Declarations
        Submitted by Plaintiffs ........................................................................ 37

CONCLUSION ............................................................................................................ 41

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                                                    ii

# TABLE OF AUTHORITIES

**Cases**

*Alaska Env't Ctr. v. Kempthorne,*
457 F.3d 969 (9th Cir. 2006) ..................................................................................... 34

*All. for the Wild Rockies v. Petrick,*
68 F.4th 475 (9th Cir. 2023) ..................................................................................... 35

*Alsea Valley All. v. Evans,*
143 F. Supp. 2d. 1214 (D. Or. 2001) ....................................................................... 40

*Am. Wild Horse Campaign v. Zinke,*
353 F. Supp. 3d 971 (D. Nev. 2018) .......................................................................... 9

*Animal Def. Council v. Hodel,*
840 F.2d 1432 (9th Cir. 1988) ............................................................................ 38, 39

*Asarco, Inc. v. EPA,*
616 F.2d 1153 (9th Cir. 1980) .................................................................................. 40

*Border Power Plant Working Grp. v. Dep't of Energy,*
260 F. Supp. 2d 997 (S.D. Cal. 2003) ...................................................................... 32

*Cal. Cmtys. Against Toxics v. EPA,*
688 F.3d 989 (9th Cir. 2012) .................................................................................... 36

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
631 F.3d 1072 (9th Cir. 2011) .................................................................................... 8

*Cascadia Wildlands v. BLM,*
153 F.4th 869 (9th Cir. 2025) .................................................................. 3, 4, 5, 6, 8

*Cascadia Wildlands v. Bureau of Indian Affairs,*
801 F.3d 1105 (9th Cir. 2015) ............................................................................ 11, 24

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) .................................................................................................. 38

*Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.,*
279 F. Supp. 3d 898 (D. Ariz. 2017) ............................................................. 11, 12, 30

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
833 F.3d 1136 (9th Cir. 2016) .................................................................................. 22

*Ctr. for Biological Diversity v. Fed. Aviation Admin.,*
804 F. Supp. 3d 86 (D.D.C. 2025) ........................................................................... 17

*Ctr. for Biological Diversity v. Spellmon,*
No. 21-cv-00047, 2022 WL 1734152 (D. Mont. Feb. 2, 2022) ............................... 39

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  450 F.3d 930 (9th Cir. 2006) ............................................................................ 38, 40

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) .................................................................................. 40

*El Puente v. U.S. Army Corps of Eng'rs*,
  100 F.4th 236 (D.C. Cir. 2024) ........................................................................ 30, 31

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) .................................................................................. 22

*Friends of Endangered Species, Inc. v. Jantzen*,
  760 F.2d 976 (9th Cir 1985) .................................................................................... 3

*Gill v. Whitford*,
  585 U.S. 48 (2018) .................................................................................................. 36

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) .................................................................................. 40

*Grunewald v. Jarvis*,
  776 F.3d 893 (D.C. Cir. 2015) ............................................................................... 10

*Hausrath v. U.S. Dept. of the Air Force*,
  491 F. Supp. 3d 770 (D. Idaho 2020) .................................................................... 13

*Headwaters, Inc. v. BLM*,
  914 F.2d 1174 (9th Cir. 1990) ................................................................................ 33

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
  42 F.3d 517 (9th Cir. 1994) .................................................................................... 40

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) .......................................................................... 38, 39

*Latin Am. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
  756 F.3d 447 (6th Cir. 2014) .................................................................................. 33

*Lee v. U.S. Air Force*,
  354 F.3d 1229 (10th Cir. 2004) .............................................................................. 26

*Marsh v. Or. Nat. Rec. Council*,
  490 U.S. 360 (1989) .......................................................................................... 15, 40

*Metro. Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983) ................................................................................................ 31

*Morongo Band of Mission Indians v. FAA*,
  161 F.3d 569 (9th Cir. 1998) .................................................................................. 14

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                                    iv

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................ 9, 26

*Native Ecosystems Council v U.S. Forest Serv.,*
   428 F.3d 1233 (9th Cir. 2005) .......................................................... 17

*Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.,*
   460 F.3d 1125 (9th Cir. 2006) .......................................................... 38

*Nw. Env't. Def. Ctr. v. Bonneville Power Admin.,*
   117 F.3d 1520 (9th Cir. 1997) .......................................................... 38

*ONDA v. BLM,*
   625 F.3d 1092 (9th Cir. 2010) .......................................................... 27

*ONDA v. BLM,*
   No. 10-cv-01331, 2014 WL 4832218 (D. Or. Sept. 29, 2014) ................................ 28

*ONDA v. Jewell,*
   840 F.3d 562 (9th Cir. 2016) ........................................................... 33

*ONDA v. Rose,*
   921 F.3d 1185 (9th Cir. 2019) .......................................................... 13

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.,*
   113 F.3d 1505 (9th Cir. 1997) .......................................................... 41

*Protect Our Communities Found. v. Jewell,*
   825 F.3d 571 (9th Cir. 2016) ............................................... 17, 19, 20, 33

*Riverkeeper Network v. F.E.R.C.,*
   753 F.3d 1304 (D.C. Cir. 2014) .......................................................... 4

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ..................................................................... 3

*Save Strawberry Canyon v. U.S. Dep't of Energy,*
   830 F. Supp. 2d 737 (N.D. Cal. 2011) ................................................... 13

*Seattle Cmty. Council Fed'n v. FAA,*
   961 F.2d 829 (9th Cir. 1992) ........................................................... 13

*Seven Cty. Infrastructure Coal. v. Eagle Cty.,*
   605 U.S. 168 (2025) ............................................................... *passim*

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. Daniel-Davis,*
   No. 20-cv-00553, 2023 WL 2744123 (D. Idaho Mar. 31, 2023) ............................. 32

*Sierra Club v. FERC,*
   867 F.3d 1357 (D.C. Cir. 2017) ......................................................... 15

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                                    v

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   803 F.3d 31 (D.C. Cir. 2015) ............................................................. 11, 25

*Stand Up for California! v. U.S. Dep't of the Interior,*
   204 F. Supp. 3d 212 (D.D.C. 2016) ........................................................ 17

*Town of Cave Creek, Ariz. v. FAA,*
   325 F.3d 320 (D.C. Cir. 2003) .............................................................. 14

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
   435 U.S. 519 (1978) ............................................................................ 35

*Washington v. U.S. Dep't of the Navy,*
   No. 19-cv-01059, 2021 WL 8445582 (W.D. Wash. Dec. 10, 2021) ........................ 14

*WildEarth Guardians v. Provencio,*
   923 F.3d 655 (9th Cir. 2019) ........................................................... 22, 24

*Wilderness Watch v. U.S. Forest Serv.,*
   No. 23-cv-00133, 2025 WL 2985292 (D. Mont. Oct. 23, 2025) .............................. 27

*Wildlife Fed'n* v. *Haaland,*
   127 F.4th 1 (9th Cir. 2025) ................................................................... 36

**Statutes**

16 U.S.C. § 1131(c) ..................................................................... 27, 29, 30

16 U.S.C. § 1133 ............................................................................. 29

42 U.S.C. § 4332(2)(C) ..................................................................... 3, 33

5 U.S.C. § 701 .................................................................................. 9

5 U.S.C. § 706 ................................................................................. 40

5 U.S.C. § 706(2)(A) ........................................................................... 9

Pub. L. No. 111-11 ............................................................................ 29

**Rules**

Federal Rule of Civil Procedure 56 ............................................................. 1

**Regulations**

32 CFR § 989.33 (1999) ........................................................................ 31

59 Fed. Reg. 32 (February 16, 1994) ........................................................... 31

59 Fed. Reg. 7,629 (Feb. 11, 1994), .......................................................... 31

84 Fed. Reg. 55,290 (Oct. 16, 2019) ........................................................ 7, 8

90 Fed. Reg. 8633 (Jan. 21, 2025) ............................................................ 31

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to this Court's March 23, 2026 Scheduling Order, the United States Department of Air Force ("DAF") hereby files its opposition to Plaintiffs' Motion for Summary Judgment (Pls.' MSJ), Dkt. No. 49.

In addition, DAF cross-moves for summary judgment under Federal Rule of Civil Procedure 56. As set forth in the following memorandum in support, DAF is entitled to summary judgment as to all of Plaintiffs' claims because the Administrative Record demonstrates that DAF's action to optimize the Special Use Airspace at Mountain Home Air Force Base was not arbitrary or capricious and was otherwise in accordance with law.

\* \* \*

## INTRODUCTION

Mountain Home Air Force Base ("Mountain Home AFB") in southwestern Idaho has been used for United States military aircraft training for over 80 years—since before DAF was established in 1947. Supersonic aircraft have been part of those training operations in the Mountain Home AFB airspace for over 50 years. By the turn of the century, evolving combat threats worldwide necessitated DAF to concentrate training operations, and Mountain Home AFB became a center for operational proficiency training with the supersonic F-15 fighter. In the face of rapid advancement in weaponry and aircraft design, it is critical for F-15 fighters to train at low altitudes to be combat-ready. Airspace restrictions on the Special Use Airspace ("SUA") associated with Mountain Home AFB, however, presented significant

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                 1

challenges to this essential training. Specifically, inconsistent operational floors applicable to training flights across the six, contiguous military operation areas ("MOAs") that make up the SUA prevented pilots from training in realistic conditions.

To ensure aircrew readiness and increase survivability in real-world combat situations, DAF decided to optimize the Mountain Home AFB airspace to create consistent operational floors for low-altitude and supersonic training flights across the six MOAs. DAF's modification of the operational floors throughout the SUA (the "Proposed Action") was the culmination of years of analysis thoroughly considering the possible environmental impacts. This analysis was memorialized in an Environmental Impact Statement ("EIS") and Record of Decision ("ROD") published in 2023.

Plaintiffs challenge the Proposed Action under the National Environmental Policy Act ("NEPA"), arguing that the EIS and ROD fail to fully analyze the effects of the airspace modification. However, Plaintiffs' claims are without merit and ultimately represent an effort to challenge DAF's substantive decision rather than the sufficiency of the analysis in the EIS. Mere disagreement or dissatisfaction with the outcome of an agency's decision is not a basis upon which to grant relief. DAF arrived at an informed and well-considered decision and reasonably explained that decision; that is all NEPA requires. DAF is entitled to summary judgment on Plaintiffs' complaint.

## LEGAL BACKGROUND

Congress enacted NEPA to ensure federal agencies consider the environmental consequences of projects and to facilitate agencies' communication with the public about their environmental analyses. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-52 (1989). As the Supreme Court recently reemphasized, NEPA is a "*purely procedural statute*" that "imposes no *substantive* constraints on the agency's ultimate decision." *Seven Cty. Infrastructure Coal. v. Eagle Cty.*, 605 U.S. 168, 180 (2025) (NEPA requires an agency "to prepare an adequate report…[and]…no more."). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350; *see also Cascadia Wildlands v. BLM*, 153 F.4th 869, 880 (9th Cir. 2025) ("NEPA does not require the agency to prioritize environmental concerns over other concerns in determining whether to proceed with a project; instead, all it requires is that the agency consider and disclose environmental impacts.").

NEPA requires that, for "major Federal actions significantly affecting the quality of the human environment," a federal agency must prepare an EIS. 42 U.S.C. § 4332(2)(C). A court's task in reviewing an EIS is "simply to ensure that the procedure followed by [the agency] resulted in a reasoned analysis of the evidence before it, and that the [agency] made the evidence available to all concerned." *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir 1985). In other words, "[c]ourts may not use their review of an agency's environmental analysis to

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                       3

second-guess substantive decisions committed to the discretion of the agency." *Del. Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *Cascadia Wildlands*, 153 F.4th at 880 ("Courts cannot substitute their judgment for that of the agency.").

**FACTUAL BACKGROUND**

## I.    Mountain Home Air Force Base and Overflight Operations

Mountain Home AFB is an DAF installation in southwestern Idaho which provides training for combat air power and combat support for the United States and its allies. AR_685. Military aircraft training in this area has been going on since the Mountain Home Army Air Field was opened in August 1942. *Id.* After DAF was established in 1947, the Army airfield became Mountain Home AFB. *Id.*

Since the early 1970s, supersonic aircraft have been based at Mountain Home AFB and operated extensively in the airspace over southwestern Idaho, eastern Oregon, and northern Nevada. AR_685. Training operations for these aircraft have historically included low-altitude flights. *Id.* (explaining aircrew flew between 200 and 400 feet above ground level ("AGL") for the majority of their 1.6-1.8 hour training flights). Between 1972 and 1986, for instance, there were between 11,200 and 12,600 low-altitude flight hours annually. *Id.* In 2002, DAF consolidated Mountain Home AFB assets to focus primarily on training for supersonic F-15E fighters, AR_687, and in 2009, DAF activated a foreign military partner squadron at Mountain Home AFB, which trains with an aircraft similar to the F-15E. *Id.*

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                4

Aircraft training operations at Mountain Home AFB are conducted within the SUA, which overlies portions of Idaho, Nevada, and Oregon, as well as the Fort McDermitt Indian Reservation and the Duck Valley Indian Reservation. AR_686-87. The SUA is divided into six contiguous MOAs: Paradise North, Paradise South, Owyhee North, Owyhee South, Jarbidge North, and Jarbidge South. *Id.* There are approximately 15,600 sorties—which encompass all flight activity from initial departure to arrival back at the base—in the SUA annually. AR_708, 710.

Prior to the Proposed Action, the operational floors for both low-altitude and supersonic flights-the lowest altitudes at which flights of either category could fly-were inconsistent across the six contiguous MOAs. AR_687-89. Two of the MOAs had low-altitude operational floors at 100 feet AGL and supersonic flight floors at 10,000 feet AGL; the other four MOAs had low-altitude operational floors at the higher of 3,000 feet AGL or 10,000 feet mean sea level ("MSL") and supersonic flight floors at 30,000 feet AGL. AR_687-89, 690 (map color-coding the MOAs based on differences in operational altitudes).[1] Training flights in the SUA are further constrained by three exclusion areas, as well as a dozen seasonal, altitude, and locational restrictions designed to reduce overflight noise over residents, recreationalists, and wildlife during specified times of the year, AR_690-91.

---

[1] Criss-crossing the MOAs are also several designated military training routes ("MTRs"). AR_688. The MTRs support navigational (but not combat) training flights down to 100 feet AGL, even through the four MOAs whose low-altitude operational floor is otherwise 3,000 feet AGL/10,000 feet MSL. *Id.* Thus, even prior to the Proposed Action, there were low-altitude flights occurring in approximately 63% of the four MOAs with higher operational floors. *Id.*

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                     5

DAF anticipates that a version of the F-15 fighter will be used for several more decades. AR_695. While the F-15 can be updated with technological upgrades, the physical airframe of the craft is a fourth-generation fighter, which lacks the advanced physical features of fifth-generation fighter. AR_693. Because the F-15 fighter is an earlier-generation aircraft, training operations are critical to ensure that F-15 aircrew are able to respond to combat threats presented by advancements in surface-to-air weaponry and the development of fifth-generation fighter aircraft by potential adversaries. *Id.* Low-altitude training ("LOWAT"), including across a diversity of terrains, is a critical component of this training as it permits aircrew to practice using physical terrain to mask the aircraft from a variety of potential threats. AR_693-96.

The differences in operational floors across MOAs presented an impediment to the training operations at Mountain Home AFB. AR_695-96.  The inconsistency created unrealistic airspace "shelves" at the borders between two MOAs with different floors, such that aircrew would have to conduct an unrealistic climb to the higher shelf in the middle of a training sortie. AR_696, 692. This artificial limit prevented pilots from training as they would need to fly in a real-world combat scenario; for example, pilots transitioning from Owyhee North to neighboring Paradise North would need to climb from 100 feet to 10,000 feet AGL as though the aircraft was about to hit a physical wall. AR_694. Similarly, an aircraft flying at supersonic speed in one MOA to evade an adversary would have to reduce speed quickly to avoid going supersonic below the authorized altitude in a neighboring MOA. AR_696. Thus, the variation in operational floors reduced the tactical value of

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                        6

current training operations, could result in counterproductive training exercises, and ultimately was insufficient to train aircrew for real-world combat scenarios in the face of rapidly evolving threats. AR_695-96.

## II. The Proposed Action and NEPA Process

In October 2019, DAF issued a notice of intent to prepare an EIS evaluating proposed changes to the Mountain Home AFB airspace to provide consistent low-level operational floors and enable more realistic essential operational training. Notice of Intent To Prepare an EIS for Airspace Optimization for Readiness, Mountain Home AFB, Idaho, 84 Fed. Reg. 55,290-01 (Oct. 16, 2019). Following this notice, DAF conducted a scoping process, holding four public scoping meetings and soliciting comments to identify concerns and develop the issues to be addressed in the EIS. AR_701-02. DAF considered the public input and comments in developing of analysis and alternatives presented in the Draft EIS. AR_701.

DAF published the Draft EIS for public review on July 9, 2021. *Id.* In addition to posting the Draft EIS on a public website, DAF sent copies to federal, state, and local agencies, tribes, and special interest groups; made copies available for review at 51 locations; and mailed copies to anyone who requested a copy. AR_703. During the three-month public comment period, DAF received 2,894 unique comment letters. *Id.* DAF also hosted four public hearings, one of which was virtual, and seven meetings with leaders and representatives of tribes. AR_5-6.

Nearly two years after the Draft EIS was published, on March 3, 2023, DAF published the Final EIS (hereafter, the "EIS") analyzing the environmental impacts

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                                          7

of the Proposed Action. AR_6, 656. DAF considered five action alternatives and a No Action Alternative for optimizing the operational floors across the six MOAs. AR_3-4, 707-38. These encompassed three alternative options for LOWAT (lowering subsonic operational floors to: (1) 100, (2) 300, or (3) 500 feet) and two alternative options for supersonic ((A) 5,000 or (B) 10,000 feet). AR_707. The EIS identified the combination of Alternatives 1 and B as the preferred combination. AR_714, 731.

Based on the EIS, in July 2023, DAF issued a Record of Decision ("ROD") selecting Alternative 1 (100-foot AGL floor for subsonic operations across all MOAs) and Alternative B (10,000-foot AGL supersonic floor across all MOAs). AR_1-10.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"),[2] 5 U.S.C. § 701 *et seq.*, a court must uphold an agency action unless the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, the "bedrock principle of judicial review" is "deference," *Seven Cty.*, 605 U.S. at 180, 185, and the agency action is presumed to be valid, *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011). Accordingly, a court's role in reviewing an agency's NEPA analysis is "limited": the court "asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cty.*, 605 U.S. at 180, 185. A court is "not to substitute its judgment for that of the agency," *Cascadia*

---

[2] Judicial review of an agency's compliance with NEPA is governed by the APA. *E.g.*, *Cascadia Wildlands*, 153 F.4th at 892.

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                    8

*Wildlands*, 153 F.4th at 892, and must affirm a decision that considered the relevant factors and articulated a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs, as the party challenging an agency action under the APA, bear the burden of showing that the agency's actions were arbitrary and capricious or otherwise not in accordance with law. *E.g.*, *Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 980 (D. Nev. 2018).

## ARGUMENT

### I.    The EIS Fully Satisfies DAF's Obligations Under NEPA

DAF extensively analyzed the potential impacts of the Proposed Action and reasonably explained that analysis, fully satisfying NEPA's requirements. *See Seven Cty.*, 605 U.S. at 180. Plaintiffs' laundry list of alleged issues with the EIS fails to identify genuine deficiencies in DAF's detailed analyses and reasoning. Plaintiffs specifically challenge DAF's consideration of impacts (1) from noise; (2) on wildlife; (3) due to the risk of flare-caused fires; and (4) on "wilderness values"; as well as its consideration of (5) environmental justice issues and (6) alternatives. Plaintiffs' arguments are without merit. DAF employed reasonable methodologies, appropriately analyzed and considered the environmental effects of the Proposed Action, and provided a thorough explanation of its reasonable conclusions. At bottom, Plaintiffs' issue is with DAF's substantive decision. But "NEPA is 'not a suitable vehicle' for airing grievances about the substantive polices adopted by an agency, as

'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (citation omitted). Instead, NEPA is a "*purely procedural statute*" that requires the agency "to prepare an adequate report… [and]…no more." *Seven Cty.,* 605 U.S. at 180 (emphases in original). Here, DAF's EIS properly analyzes the potential impacts of the Proposed Action. Accordingly, DAF is entitled to summary judgment.

### A. DAF's Analysis of Noise Impacts Is Sound

Throughout the EIS, DAF extensively analyzed the noise impacts of the Proposed Action. DAF used two different methodologies to calculate the increase in noise attributable to the Proposed Action. Primarily, DAF used DNL, a "cumulative noise metric that measures noise based on annual average daily aircraft operations." AR_780. Additionally, DAF considered $L_{max}$, the maximum noise level produced by a given event (such as a jet flying directly over an observer on the ground). *See* AR_781. With these two metrics, DAF was able to consider both the cumulative noise impact and the maximum noise impact of the Proposed Action.

Plaintiffs raise two challenges to DAF's consideration of noise impacts. *First*, Plaintiffs argue DAF used the wrong baseline noise levels in the MOA. *Second*, Plaintiffs argue DAF used the wrong methodology to evaluate the noise impacts of the Proposed Action. Both arguments fail.

### 1. DAF Identified the Proper Baseline Noise Level

To analyze noise impacts associated with the Proposed Action, DAF used baseline noise levels that properly account for the current use of the MOAs to train fighter pilots. *See* AR_785. These baseline noise levels—calculated using DNL—

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                    10

ranged from under 35 dBA in no-fly zones to 66 in airspace associated with the Saylor Creek Range. AR_786.[3] Plaintiffs, on the other hand, argue DAF should have ignored the current use of the MOAs and instead used "substantially lower baseline noise levels, around 15 dB, [that] are typical in a sagebrush landscape like the Owyhee that is sparsely populated but teeming with wildlife." Pls.' MSJ at 13.

Plaintiffs cite no authority to support the use of a baseline noise level effectively equivalent to silence in an area where military aircraft operations have been occurring for decades, in many areas at very low altitudes. NEPA only requires DAF to consider the *additional* noise caused by the proposed action, so inclusion of current operations in the baseline is wholly appropriate. *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015) ("An agency…may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured."); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 51 (D.C. Cir. 2015) (existing "effects set the baseline state of affairs and thus the context in which the significance of proposed federal action must be evaluated"); *Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 925 (D. Ariz. 2017) ("the Forest Service need only consider the incremental impact of the [project] in relation to the [overall action] to determine if the [project] will have a significant cumulative impact.").

---

[3] The baseline noise levels are measured in "A-weighted decibels" or dBA which "account for the frequency sensitivity of the human ear." AR_780, 786.

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                11

As the EIS explains, DAF calculated baseline noise levels throughout the MOAs using the onset rate adjusted monthly day-night average sound level ("$L_{dnmr}$") and yearly day-night average sound level ("DNL"). *See* AR_780, 785-86. Plaintiffs do not challenge these calculations. Instead, Plaintiffs assert that DAF "ignored" background ambient noise levels "ranging from about 25 to 40 dB (DNL)." Pls.' MSJ at 13. But DAF did not ignore these ambient noise levels. To the contrary, DAF recognized the lower ambient noise levels, but determined that "non-aircraft ambient sound levels are sufficiently low that current military aircraft sounds can be assumed to be the dominant sound source in all areas beneath the Mountain Home Range Complex." AR_791. Specifically, DAF explained that the ambient sound levels "do not affect overall sound levels as quantified using the metrics $L_{dnmr}$ or DNL." *Id*. This is because of the "logarithmic nature of the decibel unit," which means that "the total sound level produced by two sounds of different levels is usually only slightly more than the higher of the two." AR_2016. In other words, adding the low background noise to the noise caused by aircraft would result in a negligible increase in the measured sound. DAF's use of the background noise levels from current flight operations was reasonable and in compliance with NEPA. *Seven Cty.*, 605 U.S. at 181 ("The Agency is better equipped to assess what facts are relevant to the agency's own decision than a court is.").

### 2. DAF Used a Reasonable Methodology to Analyze Noise Impacts Above the Baseline Level

DAF reasonably chose to use DNL and $L_{max}$ to evaluate the increase in noise attributable to the Proposed Action. *ONDA v. Rose*, 921 F.3d 1185, 1191 (9th Cir.

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                 12

2019) ("Ordinarily, we must defer to an agency's…reasonable choice of methodology, because NEPA does not require adherence to a particular analytic protocol." (quotation omitted). Both DAF "and FAA implementing regulations require DNL to be used as the primary metric for assessment of community noise impacts." AR_795. DAF selected 65 DNL as a threshold of significance, which is the standard adopted by FAA. AR_796; s*ee also Hausrath v. U.S. Dept. of the Air Force*, 491 F. Supp. 3d 770, 788 (D. Idaho 2020).

Plaintiffs criticize DAF's use of both DNL and $L_{max}$. Specifically, Plaintiffs claim that DAF's methodology "failed to convey the magnitude, intensity, and duration of sound levels that a person or animal will actually experience during training exercises." Pls.' MSJ at 15. According to Plaintiffs, DAF should "have used the Sound Exposure Level (SEL) metric." *Id.* at 17. But courts have consistently found that "agencies are permitted to determine a threshold of significance for noise impacts." *Save Strawberry Canyon v. U.S. Dep't of Energy*, 830 F. Supp. 2d 737, 749-50 (N.D. Cal. 2011) (citing *Seattle Cmty. Council Fed'n v. FAA*, 961 F.2d 829, 833 (9th Cir. 1992).

DAF reasonably used 65 DNL, the FAA standard, as the threshold for significance for cumulative noise impacts. AR_796. An agency's choice of methodology is precisely the sort of "scientific judgment[]" to which "a reviewing court must be at its most deferential." *Seven Cty.,* 605 U.S. at 182 (quotation omitted). And courts have concluded that FAA's DNL standard is reasonable. *See Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 578 (9th Cir. 1998) (finding FAA's choice of

methodology in determining threshold of significance for noise impacts rational); *Town of Cave Creek, Ariz. v. FAA,* 325 F.3d 320, 328 (D.C. Cir. 2003) (affirming use of FAA's regulations stating "[a]ctions that do not result in noise level increases of 1.5 dB or more within the 65-or-more DNL contour are, by definition, insignificant under NEPA, because all land use activities at issue are compatible with noise levels below 65 DNL."); *see also, e.g. Washington v. U.S. Dep't of the Navy*, No. 19-cv-01059, 2021 WL 8445582, at *14 (W.D. Wash. Dec. 10, 2021) ("The Navy responded to criticism of its use of the 65 dB DNL threshold and explained why it would not use a [lower] threshold. NEPA does not require more."). Plaintiff has given the Court no reason to depart from the reasoning in those cases here.

Plaintiffs also claim "the EIS wholly failed to account for expected noise levels during the several minutes (or longer) that multiple jets may be heard during each training exercise." Pls.' MSJ at 17. But as the EIS explains, a study from 2002 found that "military aircraft noise was not audible for the great majority of the time" in the Mountain Home Range Complex. AR_791. "Individual military aircraft sorties were occasionally noticeable, with elevated noise typically lasting tens of seconds, and intense aircraft noise intrusions were rare events." *Id.* That study found, in a "seven-month study period, 4,655 sorties were monitored and the highest $L_{max}$ recorded among eight dispersed recording locations was 113 dB." *Id.*

DAF's choice of methodology is entitled to deference as it is supported by the record, within the agency's expertise, and well-reasoned. *See Marsh v. Or. Nat. Rec. Council,* 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                                      14

agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *cf. Sierra Club v. FERC*, 867 F.3d 1357, 1369 (D.C. Cir. 2017) ("The agency's methodology was reasonable, even where it deviated from what Sierra Club would have preferred."). Based on the information available, DAF made the reasonable decision to rely both on DNL and $L_{max}$ to evaluate the cumulative noise impacts of aircraft overflights and the potential single impact of a low-level flight. *See Seven Cty.*, 605 U.S. at 181 (Agencies are entitled to deference when making "scientific judgments in assessing the relevant impacts" of a proposed action).

## B. DAF Took a Hard Look at Noise Impacts on Wildlife

The record shows that DAF adequately analyzed the potential impacts of noise on wildlife. Plaintiffs challenge DAF's evaluation, however, arguing DAF irrationally concluded that noise impacts associated with the Proposed Action would not be significant. Specifically, Plaintiffs assert three arguments: (1) DAF's conclusion regarding impacts to the greater sage-grouse was arbitrary; (2) DAF's conclusion that the occurrence of overflights at any given point in the SUA would be infrequent was unreasonable; and (3) DAF failed to do site-specific analysis of wildlife habitat. Pls.' MSJ at 20. Each argument is without merit.

### 1. DAF Appropriately Analyzed the Impact of Noise on the Greater Sage-Grouse

DAF's conclusion that overall impacts from noise on greater sage-grouse populations would not reach significant levels was thoroughly explained and supported by the record. Plaintiffs claim DAF ignored the threshold at which noise

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                      15

impacts on sage-grouse become significant and statements from studies that did not support DAF's conclusions. Pls.' MSJ at 21-22. They also contend DAF did not engage with comments about sage-grouse. None of these points are compelling.

To assess potential impacts on greater sage-grouse, DAF consulted with several federal and state agencies; consulted various land management plans and monitoring protocols; quantified the changes to noise levels under each alternative; and reviewed relevant scientific studies. AR_870.  Based on its review of these studies in light of the calculated changes to the noise environment under the Proposed Action and the frequency of overflights, DAF concluded that sage-grouse exposed to noise from low level overflights would like experience some degree of stress and behavioral modifications and may exhibit startle responses, but these impacts would be brief and infrequent. AR_886–87. Thus, while some greater sage-grouse may experience temporary impacts, effects would not be long-term and the impacts across the sage-grouse population would not be significant. AR_870.

Contrary to Plaintiffs' contentions, in reaching this conclusion, DAF did not "ignore[e] contradictory evidence" regarding potential impacts to greater sage-grouse. Pls.' MSJ at 21-22. First, Plaintiffs argue that the threshold for evaluating the significance of impacts on sage-grouse is 10-dB above baseline, and DAF "dismissed" that standard. Pls.' MSJ at 21. But Plaintiffs misrepresent the EIS, which actually says that while 10 dB has been identified as a "level of concern" for noise impacts from ground-based activities, researchers have yet to determine the best metric for evaluating noise impacts from short-term, intermittent aircraft overflight. AR_885.

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                            16

DAF, nonetheless, acknowledges this 10-dB threshold in discussing potential impacts. AR_886. Plaintiffs also argue DAF ignores scientific studies that "undercut" its conclusions. Pls.' MSJ at 21-22. But Plaintiffs base this argument on two points of information among the nearly one hundred studies DAF considered. *Compare id.* (citing AR_52819 and 52829) *with* AR_52812-42. The fact that there may be conflicting results across studies does not invalidate DAF's analysis. *See Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 272 (D.D.C. 2016) ("A court may not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." (quotation omitted)). Moreover, DAF acknowledged potential negative impacts from overflight noise. *E.g.*, AR_886 (overflight noise may affect leks in certain MAOs, interfere with greater sage-grouse vocalization, and cause stress responses). *See Native Ecosystems Council v U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005) ("A 'hard look' should, of course, involve the discussion of adverse impacts.").

At bottom, DAF reasonably relied on applicable scientific studies in finding that noise effects on the greater sage-grouse would not reach significant levels. *See Ctr. for Biological Diversity v. Fed. Aviation Admin.*, 804 F. Supp. 3d 86, 100 (D.D.C. 2025); *see also See Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016) ("When the agency's determination is founded on reasonable inferences from scientific data, a reviewing court will not substitute its judgment for that of the agency." (quotation omitted)).

DAF also did not "brush aside" comments on the draft EIS related to the greater sage-grouse. Pls.' MSJ at 22. Rather, DAF considered and addressed the substantive issues raised in the comments, including additional scientific studies and the applicable noise impact threshold. *See, e.g.*, AR_1095–97; AR_1117; AR_1121. DAF responded to these concerns, explaining that it evaluated each referenced greater-sage-grouse-specific study for relevance to the Proposed Action and included additional studies in the Final EIS, and acknowledging the 10-dB threshold as a "level of concern" for greater sage-grouse. AR_1077; AR_1104. Plaintiffs also point to other agencies' comments regarding "concerns" for the greater sage-grouse. Pls.' MSJ at 22. But DAF is not required to adopt wholesale other agencies' concerns or comments. *See Wilderness Soc. v. U.S. Forest Serv.*, 850 F. Supp. 2d 1144, 1157 (D. Idaho 2012). NEPA only requires DAF to consider and respond to comments—which it did; the fact it did not agree with them is not a claim under NEPA. *See Earth Island Inst. v. Carlton*, No. 09-cv-02020, 2009 WL 9084754, at *10 (E.D. Cal. Aug. 20, 2009).[4]

Plaintiffs also claim that DAF made only "a cursory analysis of the impacts" on wildlife other than the greater sage-grouse. Pls.' MSJ at 20. However, the EIS includes separate, thorough discussions of potential impacts of the Proposed Action on a variety of wildlife. *See, e.g.*, AR_883-84 (yellow-billed cuckoo); AR_884 (slickspot

---

[4] Nor Did DAF fail to "grapple with" comments about mitigation. Pls.' MSJ at 25. DAF considered comments requesting additional mitigation and sufficiently responded. *E.g.*, AR_1104-05; AR_1124 (explaining that expanding mitigation would impact DAF's ability to achieve purpose of the Proposed Action). NEPA does not require more. *Washington v. United States Dep't of the Navy*, No. 19-cv-01059, 2021 WL 8445582, at *13 (W.D. Wash. Dec. 10, 2021).

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                            18

peppergrass and whitebark pine); AR_884 (bull trout, Lahotan cutthroat trout, and Bruneau hot springsnail); AR_885-87 (greater sage-grouse); AR_887-88 (big horn sheep); AR_888, 2066-69 (migratory birds, raptors, and eagles); AR_1891-1093 (modeling sonic boom exposure across species range or habitat for each of the preceding animals); AR_888, 2064 (terrestrial mammals); AR_2069-72 (game birds, water fowl, wading and shorebirds); AR_879 (impacts from bird-aircraft strikes). This analysis satisfies NEPA with respect to effects on wildlife. *See, e.g.*, *Protect Our Communities*, 825 F.3d at 583.

Although Plaintiffs may disagree with DAF's conclusions, they have failed to demonstrate that DAF's analysis was anything less than a "hard look" at the issue.

### 2. DAF's Conclusion Regarding Overflight Frequency Was Reasonable

DAF based its conclusion that noise impacts on the greater sage-grouse would not be significant in part on its determination that overflight frequency would be low and intermittent. AR_799. DAF based overflight frequency on actual and reasonably projected annual training hours. AR_799, 712, 717. Despite the clear connection between DAF's estimate and the facts in the record, Plaintiffs contend DAF's frequency conclusion is an inaccurate assumption that "dimiss[es] and downplay[s]" impacts to wildlife. Pls.' MSJ at 23-24. Plaintiff's' incorrect characterization ignores the relevant data from the record in favor of inapposite, cherry-picked facts. DAF's frequency conclusion is reasonable and entitled to deference.

DAF's overflight frequency conclusion is grounded in data. To estimate the frequency of low altitude overflights, DAF considered the flight training hours per

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                    19

year spent in each MOA and the area of each MOA. AR_799. As to the annual flight training hours, DAF started with a breakdown of annual training hours across eleven different altitude bands measured for each of the six MOAs (132 data points in total). *Id.*; AR_712 (data chart).[5] Although none of the alternatives directly involved an increase in annual sorties for Mountain Home AFB, lower operational floors could result in an increase in sorties by other users due to increased capacity for conducting LOWAT. AR_714. To account for this, DAF projected a 5% increase over the baseline annual training hours. *Id.*; AR_717. DAF used this data in calculating the percent of total time in a year an aircraft would be "overhead."[6] *Id.*

Plaintiffs ignore the detailed flight activity data underlying DAF's conclusion and instead focus on a single document—a Noise Study from 2003—to claim DAF's conclusion is inaccurate and counter to the evidence. Pls.' MSJ at 23-24. Plaintiffs' argument does not withstand scrutiny. First, the Noise Study is not a reasonable basis for estimating the potential impacts of the Proposed Action because the Noise

---

[5] As the variance in data across MOAs shows, contrary to Plaintiffs' claims, Pls.' MSJ at 24, DAF did not assume flight hours were "evenly distributed" in estimating overflight frequency.

[6] An aircraft is generally considered to be "overhead" if it is less than 45 degrees from vertical. AR_799. The area of airspace that is "overhead" a given location increases with altitude, such that the higher an aircraft is, the larger the area of possible airspace in which that aircraft would be "overhead" for a given point on the ground. *Id.* DAF determined the percent total time an aircraft would be overhead in a given altitude band as the same fraction of the MOA area that is overhead for that altitude. *Id.* DAF illustrates: Jarbidge South is approximately 1,148 square miles, and under Alternative 1, less than 7 hours would be spent in this MOA at between 100 and 300 feet AGL (at which less than 0.03 square mile are overhead for any given point); given this, aircraft below 300 feet AGL would be overhead any given point for less than 1 second on average per year. *Id.*

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                    20

Study "characterized the sound environment" of only the Owyhee North and Jarbidge North MOAs, and did so based on limited monitoring data from 2003, before mitigating flight restrictions were in place. AR_377925, 27; AR_692 (listing mitigation measures instituted as part of associated litigation settlement). Moreover, Plaintiffs' argument is based on only two of the report's conclusions, at the exclusion of the numerous other conclusions that align with DAF's frequency conclusion. AR_37797 ("Indigenous sources were the only ones audible for the great majority of the time at all sites.")[7]; *id.* ("High level aircraft noise intrusions were rare events."); *id.* ("[F]light operations at supersonic speeds capable of producing sonic booms audible on the ground were rare events."); AR_37798 ("The exposure to self-noise of hikers and other visitors…is typically much greater than exposure to…levels produced by aircraft operations.").

The sole case Plaintiffs cite, *Environment Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850 (9th Cir. 2022), is easily distinguishable. *See* Pls.' MSJ at 24. In that case, the agency forecasted the frequency of offshore well stimulation treatments (oil extraction techniques) for various alternatives based on historical data. *Env't Def. Ctr.,* 36 F.4th at 873. That historical data, however, was substantially incomplete due to flawed recordkeeping. *Id.* There is no such issue with DAF's data here.

---

[7] "Indigenous sources" include "wind, rain, thunder, hail, insects, bird and cattle sounds, and rustling foliage." AR_37727.

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                      21

DAF's determination that wildlife would experience overflights infrequently under the Proposed Action is based on comprehensive data, valid, and entitled to deference. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1148 (9th Cir. 2016) (rejecting NEPA claim because agency's assumption was entitled to deference because based on substantial evidence); *WildEarth Guardians v. Provencio*, 923 F.3d 655, 679 (9th Cir. 2019) (rejecting argument supported by "isolated segments" "cherry pick[ed]…from the record without considering their broader context."). As such, DAF's determination of overflight frequency reasonably supported its conclusions as to the effects of noise on wildlife.

### 3. Additional Habitat-Specific Analysis Was Not Necessary

Finally, Plaintiffs argue DAF did not take a hard look at impacts on wildlife because it did not include sufficient "site-specific analysis of impacts to key wildlife habitat." Pls.' MSJ at 24. This argument is ultimately about the style in which information is presented in the EIS, not the content of DAF's analysis.

Plaintiffs claim DAF's analysis of the impacts of *subsonic* noise on wildlife is deficient based on DAF's analysis of the impacts of *supersonic* noise on wildlife; specifically, on a handful of maps and tables summarizing sonic boom exposure levels for habitat areas across the SUA. Pls.' MSJ at 24–25. Plaintiffs contend that because DAF did not create identical maps and charts for subsonic noise, its analysis falls short of the hard look standard. "An agency, however, has discretion in deciding how to organize and present information in an EIS." *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1002 (9th Cir. 2013). The fact that the EIS's figures and tables are not

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                                    22

one-for-one between the two categories does not in and of itself mean DAF's analysis of either is deficient. *See Seven Cty.*, 605 U.S. at 181 ("[T]he question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court. Brevity should not be mistaken for lack of detail."). Moreover, subsonic and supersonic noise are scientifically distinct, and their effects are calculated differently. *See* AR_783-84. Thus, it is not only reasonable, but expected that their impacts would be discussed and presented in a different manner.

For subsonic flights, DAF calculated the time-averaged noise level changes for twenty-five different representative points throughout the SUA for each alternative considered in the EIS. *E.g.*, AR_801-02; *see also* AR_787 (map of points of interest). DAF then considered the impact of the average increases in noise on wildlife. *See, e.g.*, AR_881–90. Based on these noise increases, DAF concluded that, "although a limited number of animals may experience negative effects, overall impacts to wildlife populations from aircraft noise and visual disturbance associated with Alternative 1 would not reach significant levels." AR_882. This conclusion that noise "impacts would not be significant evince[s] a rational connection between the facts found and the conclusions made." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 672 (9th Cir. 2019) (quotation omitted).

Ultimately, whether an agency complied with NEPA turns on the substance of an EIS, not its form, *Montana Wilderness Ass'n*, 725 F.3d at 1002 and at bottom, DAF

took the requisite hard look at subsonic noise impacts on wildlife such that Plaintiffs identify no error.

## C. DAF Fully Considered Any Increased Risks of Flare-Caused Fires

The Proposed Action in this case lowered the operational floor for both subsonic and supersonic aircraft operations across the MOAs; it did *not* change-in any way-regulations governing aircraft's use of flares. Nevertheless, because lowering the operational floors may increase the use of the airspace, DAF considered the environmental impacts of a potential increase in flare-use driven by an increased use of the airspace. AR_714; *Seven Cty.*, 605 U.S. at 182 ("So long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line-including (i) how far to go in considering indirect environmental effects from the project at hand"). That analysis estimated that the adopted rule would increase the number of flares used annually by 305, bringing the total from 17,438 to 17,743 (an increase of less than 2%). AR_716.

Under NEPA, DAF was required to consider whether this *increase* in flare usage would have a significant cumulative impact. *See Cascadia Wildlands*, 801 F.3d at 1111 ("An agency…may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured."); *Sierra Club*, 803 F.3d at 51 (existing "effects set the baseline state of affairs and thus the context in which the significance of proposed federal action must be evaluated").

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                24

DAF fully considered the risks associated with a potential projected increase in flare usage. To begin, the evidence available to DAF is that "there have been no documented wildfires due to flares outside of either Juniper Butte Range or Saylor Creek Range exclusive use areas." AR_926. And at Saylor Creek Range, "only 2 out of 240 fires from 1996 to 2007 were started by flares." AR_926. Moreover, to mitigate the risk of fire, "flares are not released below 5,000 feet AGL during fire season." AR_928.

Plaintiffs' arguments completely ignore the current flare usage in the MOAs. *See* Pls.' MSJ at 26-28. For example, Plaintiffs express incredulity that, "[d]espite [a] serious risk of wildfire, Air Force plans to drop more than 17,000 pyrotechnic flares each year across this vast area." *Id.* at 26. But DAF uses over 17,000 flares annually *even without the Proposed Action. See* AR_711. Moreover, the Proposed Action has no effect on the policies governing flare usage. The only reason DAF analyzed increased flare usage is because the Proposed Action may increase the usage of the available air space, thereby increasing the number of aircraft using flares. *See* AR_716. Plaintiffs have made no arguments that usage of an additional 305 flares annually will cause a significant impact.

Plaintiffs nevertheless take issue with DAF's conclusions, pointing to "record evidence that the DAF's flares, and flares from other military overflights, have caused multiple fires in Oregon, Nevada, and elsewhere." Pls.' MSJ at 26. But the fact that fires have occurred in other areas-and may occur here—does not make the risk of fire a *per se* significant impact. *See, e.g., Lee v. U.S. Air Force*, 354 F.3d 1229, 1245 (10th

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                    25

Cir. 2004) ("The fact that an accident has since occurred does not indicate that the EIS's analysis was flawed, nor does it make necessary further discussion of the secondary effects of such an accident"). DAF has decades of data covering flare usage in the MOAs under these *same* use restrictions demonstrating that flare usage does not cause a significant risk of fire. Given this evidence, and the fact that flare usage is estimated to increase by less than 2 percent under the Proposed Action, DAF fully considered the risks and reasonably concluded that a 2 percent increase would not cause a significant impact to the environment. AR_874.

### D. DAF Appropriately Considered Impacts on Areas with Wilderness Qualities

Plaintiffs next contend that DAF failed to take a hard look at impacts to "wilderness values." Pls.' MSJ at 29. Plaintiffs allege two flaws with DAF's analysis: *first*, that DAF considered the wrong qualities; and, *second*, that any permanent change to the soundscape of lands with wilderness characteristics is significant for purposes of NEPA. *Id.* at 29-31. Both arguments are unavailing.

In assessing impacts to Wilderness Areas, Wilderness Study Areas ("WSAs") and lands with wilderness characteristics ("LWCs") (together "wildlands"), DAF considered how the Proposed Action would affect wilderness qualities referenced in the definition of "wilderness" in The Wilderness Act, which reads:

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                         26

> A wilderness…is hereby recognized as an area where the earth and its community of life are *untrammeled* by man…. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its *natural* conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the *imprint of man's work substantially unnoticeable*; (2) has outstanding opportunities for *solitude or a primitive and unconfined type of recreation*; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or *other features* of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c) (emphases added); AR_829, 1998-99. Based on this definition, DAF evaluated potential impacts as to: untrammeled, natural, undeveloped, solitude or primitive and unconfined recreation, and other features of value. AR_829, 1998-99 (explaining each of these five qualities). Contrary to Plaintiffs' allegation that these factors are "newly contrived," Pls.' MSJ at 30, the factors map onto the statute and have been used by other agencies in evaluating impacts to the wilderness character of land. *See, e.g.*, *Wilderness Watch v. U.S. Forest Serv.*, No. 23-cv-00133, 2025 WL 2985292, at *5 (D. Mont. Oct. 23, 2025). It was reasonable for DAF to use these factors here.

Plaintiffs' contention that impacts to wilderness may only be evaluated by reference to "size," "naturalness," and "outstanding opportunities for either solitude or primitive and unconfined recreation," Pls.' MSJ at 29, is inconsistent with the statutory text and unsupported by authority. Plaintiffs cite no case in which a court employed their three-factor test. Indeed, in the one case they do cite, *ONDA v. BLM*, 625 F.3d 1092 (9th Cir. 2010), the court of appeals did not adopt Plaintiffs' three

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                    27

factors; instead, the court simply quoted the full text of the statutory definition of "wilderness"—the same definition quoted above. When Plaintiff ONDA made a similar argument in another case in this District, the court rejected it. *See ONDA v. BLM*, No. 10-cv-01331, 2014 WL 4832218, at \*20 n.12 (D. Or. Sept. 29, 2014) (rejecting claim that agency's wilderness designation "was not based on the relevant factors," where agency considered additional factors besides roadlessness, size, naturalness, and opportunities for solitude or primitive recreation). The factors considered by DAF were appropriate and facilitated a comprehensive impacts assessment.

Plaintiffs' second argument is similarly flawed. Plaintiffs contend that DAF's analysis is faulty because the "loss of *any one* of the" three factors Plaintiffs identified means the area "no longer qualif[ies] as wilderness." Pls.' MSJ at 30. And Plaintiffs suggest that "activities that generate noise may greatly disturb users seeking quiet and solitude." *Id.* (quotation omitted). There is no support for Plaintiffs' one-strike-and-you're-out standard, and even if there was, Plaintiffs cannot show that DAF's determination violated that standard.

Plaintiffs' argument wrongly equates solitude with silence. Under BLM guidance on inventorying LWCs, the impacts of sound on opportunities for solitude is considered "if these impacts are *pervasive and omnipresent*." BLM, BLM MANUAL 6310 - CONDUCTING WILDERNESS CHARACTERISTICS INVENTORY ON BLM LANDS at 12 (2021) (emphasis added); *see* AR_1999-2000 (referencing BLM Manual). Solitude is not defeated by occasional sounds, including those from aircraft. Indeed, six of the

seven designated wilderness areas within the SUA have statutory exceptions for "low-level overflights of military aircraft over the areas…including military overflights that can be seen or heard within the wilderness areas." The Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991 (Mar. 30, 2009); *id.* ("Nothing in this subtitle restricts or precludes…the designation or creation of new units of special use airspace, or the establishment of military flight training routes, over the wilderness areas."); *see also* 16 U.S.C. § 1133-(d)(1) (permitting aircraft use within areas designated as wilderness).

The record demonstrates that DAF thoroughly assessed the potential impacts of the Proposed Action on wildlands. AR_828-54. DAF performed a qualitative assessment of each alternative based on the expected change to the noise environment and the level of sensitivity associated with the land use. *Id.* This involved calculating the difference between current noise levels and projected noise levels for dozens of wildlands under each alternative considered. AR_830-31, 835-36, 839-42, 845, 849-52, 2000-02. DAF then evaluated and discussed these possible changes as they apply to each of the wildlands. *Id.* While most of the wildlands within the SUA are already exposed to some level of military aircraft noise, AR_830, DAF acknowledged that some of the increases in noise "could be perceived by some people as significant with regard to impacts on solitude and quietness," AR_851. DAF concluded, however, that the Proposed Action's impact on the character of wilderness areas was not significant because there were no other impacts or degradation to the natural qualities of the wildlands and mitigation measures, such as seasonal

avoidance, would effectively reduce the severity of impacts in the areas most impacted by the Proposed Action. AR_830-52, 854.

DAF's analysis of the impacts on wilderness was thorough and reasonably explained, and its conclusion has a rational basis in the record. DAF thus fully satisfied its NEPA obligation. *Seven Cty.*, 605 U.S. at 180, 185.

### E. DAF Properly Analyzed Environmental Justice Impacts

DAF appropriately considered impacts to environmental justice ("EJ") communities in its analysis of the Proposed Action.[8] DAF included EJ communities in its review process and analyzed how the Proposed Action may impact those communities. In conjunction with the NEPA process, DAF consulted with several federally recognized tribal governments, including with the Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation and the Shoshone-Paiute Tribes of the Duck Valley Indian Reservation. AR_908-09. This consultation included letters, phone calls, and multiple meetings with many of the tribes. *Id.* at 909. DAF also thoroughly considered the potential impacts of the Proposed Action on minority and low-income populations. DAF identified census tract subdivisions beneath the affected MOAs in which the population of the subdivision had a higher

---

[8] DAF's applicable Environmental Impact Analysis Process 32 CFR § 989.33 (1999), provided that the agency should comply with Executive Order 12898, which directed agencies to identify, as practicable, "disproportionately high and adverse human health or environmental effects…on minority populations and low-income populations." Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994). Executive Order 12898 did not "create any right to judicial review," *id.* at 7,633, and it was revoked by Executive Order 14173 in 2025. 90 Fed. Reg. 8633 (Jan. 21, 2025). DAF's EJ analysis is therefore reviewed under NEPA's substantially deferential arbitrary and capricious standard. *E.g.*, *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 251 (D.C. Cir. 2024).

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                            30

percentage minority or low-income population than the overall census tract to which it belongs; it presumed that such subdivisions—including multiple subdivisions within tribal reservations—were EJ communities. AR_958-62. DAF then assessed how changes in the noise environment under the various alternatives would impact each EJ community, concluding that some had a potential for disproportionately high adverse impacts. AR_965-69.

Plaintiffs take no issue with this analysis. *See* Pls.' MSJ at 31-32. Instead, Plaintiffs contend that existing overflight operations already have adverse impacts on tribal reservations and that the EIS "barely discusse[s]" the potential impacts of changes to noise levels due to expansions in overflight operations. *Id*. Plaintiffs' arguments find no support in the record.

First, Plaintiffs fail to show how impacts from already-existing overflight operations renders DAF's analysis of the Proposed Action deficient. Moreover, NEPA requires agencies to consider the reasonably foreseeable environmental effects of "the proposed federal action." 42 U.S.C. § 4332(2)(C). As discussed above, agencies may satisfy their NEPA obligations by examining the incremental impact of the proposed action beyond baseline or existing conditions. Plaintiffs' complaints regarding *existing* conditions, which are not attributable to the Proposed Action, are not a basis for a claim under NEPA. *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 779 (1983) ("NEPA…does not create a remedial scheme for past federal actions. It was enacted to require agencies to assess the future effects of future actions.").

Plaintiffs' second contention—that the EIS "barely discusse[s]" the potential impacts of higher noise levels—is belied by the record. DAF identified noise and startle effects from low-altitude overflights as adverse effects resulting from implementing the Proposed Action. AR_966. It then separately discussed the potential impacts of those effects across each of the census tract subdivisions identified as EJ communities. AR_967-68. As to two of the subdivisions within the Duck Valley Indian Reservation, for instance, the EIS concluded there would not be disproportionately high and adverse impacts because the noise environment within those areas under the Proposed Action would remain consistent with the No Action Alternative. AR_967. That is, the noise impacts would be essentially the same with or without the Proposed Action.

Comparatively, the EIS found two other subdivisions—one of which includes the Fort McDermitt Indian Reservation—did have a potential for disproportionately high adverse impacts as they would experience an increase in noise levels coupled with the likelihood housing in the area may be under-insulated. *Id.* (explaining subsonic noise levels in these areas would increase by as much as 13 dB $L_{dnmr}$ under Alternative 1 and supersonic noise levels would increase by 2 dB CDNL under Alternative A).

Critically, under NEPA, "an agency is not required to select the course of action that best serves environmental justice, only to take a 'hard look' at environmental justice issues." *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. Daniel-Davis*, No. 20-cv-00553, 2023 WL 2744123, at *16 (D. Idaho Mar. 31, 2023) (citation omitted); *see*

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                      32

*also Latin Am. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 476 (6th Cir. 2014) ("Just as the [agency] is not required to select an alternative with the least environmental impact under NEPA, the [agency] is not required to select an alternative with the least environmental justice impact."). Here, Plaintiffs fail to cite a single case in support of their arguments, which amount to mere disagreements with the agency's ultimate decision.[9] The EIS's EJ analysis was reasonable and adequately explained, which fully satisfies the agency's obligation under NEPA.

### F. DAF Considered Appropriate Alternatives

Finally, DAF properly analyzed reasonable alternatives for the Proposed Action. In its statement of purpose and need, DAF explained that the Proposed Action is intended "to provide a more realistic and regularly accessible training airspace to enable aircrew to counter and defeat technologically advanced air and ground threats." AR_696. This statement informed DAF's identification of potential alternatives. *See Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 579 (9th Cir. 2016) (The purpose and need statement "should inform the agency's review of alternatives to the proposed action and guide its final selection."). An agency's range of alternatives is reviewed under a "rule of reason" standard that "requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990). "An agency need not…discuss alternatives similar to alternatives actually considered, or alternatives

---

[9] The sole decision Plaintiffs cite in this section of their brief, *ONDA v. Jewell*, 840 F.3d 562 (9th Cir. 2016), does not discuss an agency's analysis of EJ impacts under NEPA.

which are infeasible, ineffective, or inconsistent with the basic policy objectives [of the project]." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006).

Here, based on the stated purpose and need for the Proposed Action, DAF considered alternatives that met six criteria: 1) "Provide low-altitude airspace that supports realistic LOWAT certification and currency requirements"; 2) "Provide consistent low-altitude operations to build and maintain aircrew LOWAT proficiency"; 3) "Provide opportunities for realistic low-altitude flight operations in mountainous areas for terrain masking from opposing threats"; 4) "Provide for realistic and consistent supersonic operations across long distances"; 5) "Provide airspace with minimal transit time to accomplish LOWAT"; and 6) "Provide airspace scheduled by Mountain Home AFB." AR_697–99. Plaintiffs have not challenged the purpose and need of the Project or these criteria.

DAF considered five action alternatives in light of the purpose and need of the Proposed Action, as well as a No Action Alternative. AR_714–40. The action alternatives consisted of a combination of: (i) one of three alternatives for subsonic operational floors (Alternatives 1, 2, and 3), and (ii) one of two alternatives for supersonic operational floors (Alternatives A and B). AR_741. Under all of the action alternatives, the 100-foot AGL subsonic floors remain in Jarbidge North and Owyhee North. *Id.* Alternatives 1, 2, and 3 included lowering the subsonic operational floor for the remaining four MOAs to 100 feet AGL, 300 feet AGL, and 500 feet AGL respectively. *Id.* Alternatives A and B included lowering the supersonic floor across all MOAs to 5,000 feet AG or 10,000 feet AGL respectively. *Id.*

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                          34

Plaintiffs complain that DAF failed to consider an unspecified alternative that was purportedly "urged by federal, state, local, and Tribal representatives." Pls.' MSJ at 33. But Plaintiffs do not identify a specific alternative that DAF failed to consider. The closest Plaintiffs come to identifying their proposed alternative is a vague reference to "temporal and geographic restrictions" for the MOA. Pls.' MSJ at 33. This does not suffice to state a claim under NEPA. It is "incumbent upon [those] who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to [the party's] position and contentions." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978). Plaintiffs' failure to identify a specific alternative raised during the administrative process results in waiver of the claim. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 489 (9th Cir. 2023) ("challengers to government action cannot avoid waiver with 'cryptic and obscure' objections or issues presented at a very high level of generality." (citing *Vt. Yankee*, 435 U.S. at 553-54)).

Even if Plaintiffs' vague allusion to "temporal and geographic restrictions" is sufficient to identify a reasonable alternative, DAF sufficiently addressed why it would not consider significant restrictions on use. The EIS explains that "[c]omplete avoidance of these areas for extended periods of time would jeopardize the DAF's ability to effectively implement the Proposed Action because training objectives could not be accomplished in an operationally realistic manner." AR_854.

Contrary to Plaintiffs claims, the EIS did not take "an all-or-nothing approach to low altitude training," Pls.' MSJ at 32, but considered reasonable alternatives that

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                                    35

could meet the purpose and need of the Proposed Action—which Plaintiffs have not challenged—which *required* low altitude flight training. AR_697–98. "NEPA does not require [an agency] to explicitly consider every possible alternative to a proposed action," only "reasonable or feasible" alternatives. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868, 871 (9th Cir. 2004). Here, DAF considered the alternatives that were reasonable or feasible in light of the Proposed Action's purpose and need, satisfying NEPA.

### G. Vacatur is Not an Appropriate Remedy for Any of the Deficiencies Alleged by Plaintiffs.

DAF is entitled to summary judgment on all of Plaintiffs' claims. If, however, the Court grants Plaintiffs summary judgment, vacatur of the DAF's Proposed Action (as embodied in the ROD) is not the default remedy, as Plaintiffs contend. Pls.' MSJ at 35; *see Seven Cty.*, 605 U.S. at 185 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS."). As an equitable remedy, vacatur should only be imposed after weighing the seriousness of the agency's error against the disruptive consequences of vacatur. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Thus, rather than automatically vacating an agency action, courts must "consider whether on remand, a different result may be reached." *Mont. Wildlife Fed'n* v. *Haaland*, 127 F.4th 1, 51 (9th Cir. 2025) (quotation omitted). Further, a "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 50

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                             36

(2018). Accordingly, the proper remedy, if any, will be contingent on which claims the Court finds meritorious.

DAF therefore respectfully requests the opportunity to provide supplemental briefing on remedy should Plaintiffs prevail on any aspect of their complaint, although, for all the reasons stated above, they should not. *See, e.g., ONDA v. Zinke*, No. 12-cv-00596, Dkt. No. 89 (D. Or. Dec. 21, 2016) & Order, *Zinke*, No. 12-cv-00596, Dkt. No. 90 (joint status report and order adopting schedule for separate briefing as to the issue of the proper remedy) *See ONDA v. Zinke*, No. 12-cv-00596, Dkt. Nos. 89 & 90 (D. Or. Dec. 21, 2016)  (joint status report and order adopting schedule for separate briefing as to the issue of the proper remedy).

## II.    Plaintiffs' Extra-Record Declarations Should Be Stricken[10]

It is a bedrock principle of administrative law that, in reviewing an agency action, courts are confined to the Administrative Record created by the agency. Plaintiffs, however, attempt to expand this limited review by citing to and relying on post-decisional declarations filed along with their Motion for Summary Judgment. *See* Dkt. Nos. 50-56 (Declarations of Dr. Julie Weikel, Peter Bradley, Scott Bowler, John Robison, Craig Gehrke, Arnold Thomas, and Dr. Jesse Barber). The Court should reject this attempt because Plaintiffs have made no showing that any of the narrow exceptions to the Administrative Record review rule applies.

---

[10] As required by LR 56-1(b), DAF asserts its objection to Plaintiffs' extra-Record evidence as part of its Cross-Motion and Response, rather than separately filing a motion to strike. Counsel for DAF conferred with counsel for Plaintiffs in accordance with LR 7-1(a), and Plaintiffs oppose DAF's request to strike the declarations.

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                        37

The APA provides that "the court shall review the whole record or those parts of it cited by a party," and makes no provision for extra-record review. 5 U.S.C. § 706; *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("review is to be based on the full administrative record" that was before the agency at the time of its decision). The rule limiting judicial review to the agency's Administrative Record protects the integrity of the administrative process and precludes a reviewing court from conducting a *de novo* trial and substituting its opinion for that of the agency. *See Lands Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005). While Plaintiffs may submit declarations for the purpose of establishing standing, *see Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527-28 (9th Cir. 1997), "consideration of extra-record evidence to determine the correctness or wisdom of the agency's decision is not permitted." *Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1144 (9th Cir. 2006) (simplified).

The Ninth Circuit recognizes four "extremely narrow" circumstances where supplementing an administrative record may be justified: (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) when the agency has relied upon documents or materials not included in the record; (3) where necessary to explain or clarify technical matters involved in the agency action; and (4) where there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decision-makers. *Animal Def. Council v. Hodel*, 840 F.2d 1432,1436-37 (9th Cir. 1988); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006). The Ninth Circuit

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                              38

has admonished that "[t]he scope of these exceptions permitted by our precedent is constrained, so that the exception does not undermine the general rule." *Lands Council*, 395 F.3d at 1030.

As the party seeking to introduce extra-record material, Plaintiffs bear the burden of making a "strong showing" that the declarations they proffer falls within one of these exceptions. *See Animal Def. Council,* 840 F.2d at 1437-38. And in making that showing, they must overcome the presumption that the agency properly designated the administrative record with clear evidence that the administrative record is so inadequate that it will frustrate judicial review. *Ctr. for Biological Diversity v. Spellmon*, No. 21-cv-00047, 2022 WL 1734152, at *2 (D. Mont. Feb. 2, 2022).

Here, Plaintiffs make no showing whatsoever, let alone a "strong showing," that the declarations they proffered fall into any exception. Plaintiffs provided two, perfunctory justifications in a footnote: that the Court may consider them for standing and that "[t]he Court may also consider these declarations, along with Dr. Barber's declaration, 'to determine whether [DAF] has considered all relevant factors and explained its decision.'" Pls.' MSJ at xi n.a.[11] This single-sentence argument fails to overcome the presumption of regularity owed to the Administrative Records submitted to this Court.

---

[11] DAF does not object to the Court's consideration of the declarations solely for the purpose of evaluating standing.

In record review cases, it is inappropriate for a party to submit extra-record materials in an effort to attack the substantive basis of an agency's decision. *See Ctr. for Biological Diversity*, 450 F.3d at 943-44. Courts may not consider technical testimony submitted for the purposes of challenging the "scientific merit" of the agency's decision. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1161 (9th Cir. 1980). Such information invites an impermissible "battle of the experts" and should be excluded from judicial review. *See e.g., Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 526 (9th Cir. 1994) (per curiam); *Alsea Valley All. v. Evans*, 143 F. Supp. 2d. 1214, 1216-17 (D. Or. 2001) (expert opinion regarding the sufficiency of the agency decision falls outside the record and is thus properly stricken).

Dr. Barber's declaration in particular impermissibly "provide[s] [his] professional opinion about the United States Air Force's Environmental Impact Statement (EIS) of the Airspace Optimization for Readiness for Mountain Home Air Force Base Decision" and his "professional judgment regarding the depth and accuracy" of DAF's analysis. Barber Decl., at ¶¶ 2,7, Dkt. No. 56. Plaintiffs may disagree with how DAF analyzed noise impacts in the EIS, but that does not provide a basis for supplementing the Administrative Record with Dr. Barber's declaration. *See, e.g., Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992) ("Although Greenpeace has demonstrated that some scientists dispute the [agency's] analyses and conclusions, such a showing is not a sufficient basis for us to conclude that the [agency's] action was arbitrary or capricious.")*Earth Island Inst. v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010) (declining to engage in a "battle of the experts"); *Marsh*, 490

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                  40

U.S. at 378 ("when specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive"). Dr. Barber's declaration is nothing more than a challenge to the merits of DAF's analyses.

DAF's ROD and EIS were reasonable and well-supported by the Administrative Record, such that there is no need for the Court to look beyond the agency's Record to address the merits of the Plaintiffs' claim under the APA. By reserving their declarations for litigation, in particular Dr. Barber's declaration, Plaintiffs attempt to frustrate the very purpose of NEPA review by asking the Court to review DAF's well-reasoned decision based on analysis and evidence that Plaintiffs compiled *after* the agency issued its decision. Plaintiffs have not sought leave to admit extra-record evidence, nor have they identified any legal basis for this Court to go beyond the Administrative Record here. Therefore, the Court should strike Plaintiffs' declarations and any portions of Plaintiffs' arguments that rely on these declarations.

## CONCLUSION

For the foregoing reasons, Defendants' Cross-Motion for Summary Judgment should be granted, Plaintiffs' Motion for Summary Judgment should be denied, and Plaintiffs' post-decisional, extra-Record declarations should be stricken.

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                 41

Respectfully submitted this 24th day of April, 2026,

ADAM GUSTAFSON
Principal Deputy Assistant Attorney
General
United States Department of Justice
Environment & Natural Resources Division

*s/ Genevieve Geiger*
GENEVIEVE GEIGER (CO Bar 53820)
KYLE LYONS-BURKE (DC Bar 1655452)
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 341-2137
genevieve.geiger@usdoj.gov
kyle.lyons-burke@usdoj.gov

*Attorneys for Defendant United States*
*Department of the Air Force*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,848 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

s/ *Genevieve Geiger*

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE                                                                42

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of April 2026, a true copy of the foregoing was served electronically through the Court's CM/ECF system with the Court and all registered counsel.

s/ *Genevieve Geiger*

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE                                                                                      43